UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

October 2019 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR No. 20CR00035-JFW |
| Plaintiff, | I N D I C T M E N T |
| v. | [18 U.S.C. § 1001(a)(1): Falsifying Material Facts; 18 U.S.C. § 1001(a)(2): Making False Statements; 18 U.S.C. § 1512(b)(3): Tampering with a Witness, Victim, or Informant and Obstruction of Justice] |
| MITCHELL ENGLANDER, | |
| Defendant. | |

The Grand Jury charges:

INTRODUCTORY ALLEGATIONS

At times relevant to this Indictment:

A. THE CORRUPTION INVESTIGATION INTO THE LOS ANGELES CITY COUNCIL

1. The Federal Bureau of Investigation ("FBI") in Los Angeles and the United States Attorney's Office ("USAO") for the Central District of California were conducting a federal criminal investigation into public corruption throughout the City of Los Angeles (the "City") related to multiple suspected "pay-to-play" schemes (the "Federal Investigation"). The Federal Investigation involved multiple City officials, developers, investors, consultants,

lobbyists, and other close associates working in furtherance of the potentially illegal schemes.

B.    RELEVANT PERSONS AND ENTITIES

2.    All legislative power in the City was vested in the City Council and was exercised by ordinance, subject to a veto by the Mayor.  The City was split into fifteen City Council Districts ("CD"s), which covered different geographic areas.  The City Council was composed of members who were elected from each district.  City Councilmembers and their staff members were agents of the City of Los Angeles, a government that received more than $10,000 per fiscal year in funds from the United States in the form of grants, contracts, subsidies, loans, guarantees, insurance, and other forms of federal assistance.

3.    Defendant MITCHELL ENGLANDER was the councilmember for CD 12 in the San Fernando Valley from 2011 until he resigned on December 31, 2018 with almost two years remaining on his term.  Defendant ENGLANDER served as the Council President Pro-Tempore and was on the Planning and Land Use Management ("PLUM") Committee until his resignation from City Council in December 2018.  While a councilmember, defendant ENGLANDER also served on other various City committees, including as the Chair of the Public Safety Committee, and member of the Budget and Finance Committee.  Defendant ENGLANDER was also a reserve member of the Los Angeles Police Department.

4.    Under the California Political Reform Act, Cal. Gov. Code Sections 81000, et seq., every elected official and public employee who made or influenced governmental decisions was required to submit a Statement of Economic Interest, also known as the Form 700.  The Form 700 was filed annually in April for the previous year.  The Form

700 was designed to provide transparency and accountability, including by: (1) providing the public with information about an official's personal financial interests to determine whether officials were making decisions free from conflicts of interest; and (2) reminding the public official of potential conflicts of interest so the official could abstain from making or participating in governmental decisions that would raise those conflicts of interest.

5. Businessperson A operated businesses in the City relating to major development projects. Defendant ENGLANDER first met Businessperson A in or around 2016. Businessperson A was seeking to increase his business opportunities in the City. Among the ways Businessperson A would accomplish this was to provide certain elected and other public officials with cash payments, gambling chips, hotel rooms, luxury outings, escort services, and expensive meals.

6. City Staffer A was City Councilmember A's special assistant from approximately June 2013 until approximately January 2018.

7. City Staffer B was a high-ranking staff member for defendant ENGLANDER until approximately June 2017.

8. Lobbyist A and Lobbyist B were lobbyists registered with the City. Lobbyist B was also a close associate of defendant ENGLANDER.

9. Developer A was a real estate developer and architect in the City who operated his own architectural, planning, and development firm.

10. Developer B was the chief executive officer and owner of a construction company in the City.

11. Confide was a company that provided an end-to-end encrypted messaging application. On its website, Confide boasted that it "is

known for its self-destructing messaging system that deletes messages immediately after reading."

C.   BACKGROUND ON CITY PROCESSES

12.   Within the City, large-scale development projects required a series of applications and approvals prior to, during, and after construction.  These applications and approvals occurred in various City departments, including the City Council, the PLUM Committee, the Economic Development Committee, the Los Angeles Planning Department, the Los Angeles Department of Building and Safety, the Area Planning Commission, the City Planning Commission, and the Mayor's Office.

13.   Each part of the City approval process required official actions by public officials.  These included entitlements, variances, general plan amendments, subsidies, incentives, public benefits, scheduling agendas for the various committees, and overall approvals. The process allowed for public hearings, feasibility studies, environmental impact reports, and other steps in the life of development projects.

14.   Even for projects that were not going through the City approval process, City officials could benefit, or take adverse action against, a project by advocating for, pressuring, or seeking to influence other City officials, departments, business owners, and stakeholders.

D.   FINANCIAL BENEFITS FROM BUSINESSPERSON A TO DEFENDANT ENGLANDER AND OTHERS

**June 2017 Las Vegas Trip**

15.   On or about June 1, 2017, defendant ENGLANDER traveled to Las Vegas with, among others, Businessperson A, City Staffer A, City Staffer B, Lobbyist A, and Developer A (the "June 2017 Las Vegas

4

1   trip"). Businessperson A provided defendant ENGLANDER, City Staffer
2   A, City Staffer B, and others with hotel rooms at a resort and casino
3   (the "Resort and Casino"). Specifically, Businessperson A provided
4   them use of Businessperson A's "comps," which were hotel-provided
5   amenities ordinarily limited to VIP customers who, like
6   Businessperson A, were typically provided such status because of the
7   amount of money that customer had provided the hotel in the past and
8   in order to incentivize further business. Businessperson A also
9   provided the group transportation from the Las Vegas airport to the
10  Resort and Casino.

11      16.  On or about June 1, 2017, defendant ENGLANDER accepted an
12  envelope containing $10,000 in cash from Businessperson A in the
13  Resort and Casino's bathroom.

14      17.  On or about June 1, 2017, Businessperson A, in front of the
15  group, provided defendant ENGLANDER and the rest of the group casino
16  chips with which to gamble. Businessperson A provided defendant
17  ENGLANDER approximately $1,000 in casino chips. After defendant
18  ENGLANDER finished gambling, he, in front of the group and in view of
19  the casino surveillance cameras, returned the casino chips to
20  Businessperson A.

21      18.  On or about June 1, 2017, Businessperson A provided dinner
22  and drinks for defendant ENGLANDER, City Staffer A, City Staffer B,
23  Lobbyist A, Developer A, and others at a restaurant inside the Resort
24  and Casino. Businessperson A was charged approximately $2,481 for
25  the dinner and drinks for the group.

26      19.  On or about the evening of June 1, 2017 and into the early
27  morning of June 2, 2017, defendant ENGLANDER, Businessperson A, City
28  Staffer A, City Staffer B, Lobbyist A, and Developer A took a

limousine provided by the Resort and Casino to a nightclub at another hotel (the "nightclub").  At the nightclub, Businessperson A paid approximately $24,000 for bottle service and alcohol for defendant ENGLANDER, Businessperson A, City Staffer A, City Staffer B, Lobbyist A, Developer A, and others.  Developer A paid another approximately $10,000 for bottle service and alcohol for the group and others at the nightclub.

20.  After the group returned to the Resort and Casino in the early morning of June 2, 2017, Businessperson A told defendant ENGLANDER that Businessperson A was going to order female escorts for the group to come to their hotel.  When two escorts arrived to the Resort and Casino, Businessperson A paid approximately $300-400 in cash for their services and instructed one of the escorts to go to defendant ENGLANDER's hotel room to provide him with services.

21.  On or about June 3, 2017, the day after the Las Vegas trip, City Staffer B sent Businessperson A a text message thanking Businessperson A for the enjoyable Las Vegas trip.  The text message stated nothing about City Staffer B or defendant ENGLANDER reimbursing Businessperson A for any portion of the Las Vegas trip.

**Palm Springs Event and Lunch**

22.  From on or about June 10 through June 12, 2017, defendant ENGLANDER attended a golf tournament at the Morongo Casino Resort and Spa in Palm Springs, California (the "Palm Springs event").  On or about June 12, 2017, at the Palm Springs event, defendant ENGLANDER accepted an envelope containing $5,000 in cash from Businessperson A in a bathroom.

23.  On June 19, 2017, approximately one week after the Palm Springs event, defendant ENGLANDER, Businessperson A, and Developer B

had lunch so that defendant ENGLANDER would introduce Businessperson A and his company and product to Developer B.

24.   After the lunch on June 19, 2017, Developer B sent defendant ENGLANDER and Businessperson A an email thanking Businessperson A for lunch and seeking to set up a further meeting and "presentation" from Businessperson A.

E.   THE INVESTIGATION OF BENEFITS RECEIVED BY DEFENDANT ENGLANDER FROM BUSINESSPERSON A

25.   Beginning on or about June 5, 2017, based on information obtained in a judicially authorized intercepted phone call referencing benefits received by public officials from Businessperson A, the FBI and USAO began specifically investigating whether Businessperson A had provided personal benefits to defendant ENGLANDER, City Staffer A, Councilmember A, or City Staffer B, and whether those public officials, including defendant ENGLANDER, had accepted such personal benefits.

26.   On July 11, 2017, the FBI contacted City Staffer B and informed him that it sought a voluntary interview with him regarding an ongoing investigation.  On July 13, 2017, the FBI contacted City Staffer B again and informed him that it sought a voluntary interview with him regarding an ongoing investigation.

27.   On July 19, 2017, the FBI and USAO interviewed Businessperson A, with Businessperson A's counsel present, regarding the Federal Investigation, including the 2017 Las Vegas trip.  On or about August 10, 2017, Businessperson A began cooperating with the FBI and USAO in the Federal Investigation.

28.  On August 16, 2017, the FBI and USAO interviewed City Staffer B, with City Staffer B's counsel present, regarding the Federal Investigation, including the 2017 Las Vegas trip.

29.  The Introductory Allegations are incorporated into each count of this Indictment.

COUNT ONE

[18 U.S.C. § 1001(a)(1)]

A.   SCHEME TO FALSIFY AND CONCEAL MATERIAL FACTS

30.   From in or about August 2017, to on or about December 31, 2018, in Los Angeles County, within the Central District of California, and elsewhere, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the USAO and FBI, defendant ENGLANDER knowingly and willfully falsified, concealed, and covered up by trick, scheme, and device material facts, namely that:

a.   Defendant ENGLANDER had accepted from Businessperson A items of value, such as cash payments, escort services, hotel rooms, luxury outings, and expensive meals;

b.   Defendant ENGLANDER had attempted to coordinate statements he made to the FBI and USAO with Businessperson A; and

c.   Defendant ENGLANDER had counseled Businessperson A to lie to and mislead the FBI and USAO.

B.   OPERATION OF THE SCHEME

31.   Defendant ENGLANDER carried out the trick, scheme, and device, in substance, by conducting an obstruction and witness tampering campaign in the following manner:

a.   After learning about the Federal Investigation, in or around August 2017, defendant ENGLANDER privately sent an encrypted message to Businessperson A via Confide.  Defendant ENGLANDER stated in his message that he wanted to reimburse Businessperson A for portions of the June 2017 Las Vegas trip.

b.   After the FBI contacted defendant ENGLANDER on or about September 1, 2017, to seek a voluntary interview with him

1   regarding an ongoing investigation, defendant ENGLANDER sent a check
2   payable to Businessperson A that made it appear as if defendant
3   ENGLANDER had written the check to Businessperson A to reimburse him
4   for certain expenses related to their Las Vegas trip prior to the FBI
5   asking to interview defendant ENGLANDER and prior to the FBI
6   interviewing City Staffer B.   On September 14, 2017, Businessperson A
7   received a FedEx package containing a $442 check (check number 4387)
8   from defendant ENGLANDER payable to Businessperson A that bore a date
9   of August 4, 2017.   The package also contained a second $442 check
10  (check number 1095) from City Staffer B payable to Businessperson A,
11  which also bore a date of August 4, 2017.   A note included in the
12  package from defendant ENGLANDER indicated the checks were for "Vegas
13  expenses."

14          c.   On October 4, 2017, defendant ENGLANDER met
15  Businessperson A, who was acting at the direction of law enforcement,
16  for lunch in Downtown Los Angeles.   During the lunch, defendant
17  ENGLANDER and Businessperson A discussed the June 2017 Las Vegas trip
18  and the Federal Investigation, including that Businessperson A had
19  been interviewed and their understanding that City Staffer A and City
20  Staffer B also had been interviewed by the FBI.   Defendant ENGLANDER
21  told Businessperson A that he had an upcoming interview with the FBI;
22  he further stated that City Staffer B told defendant ENGLANDER to
23  tell the FBI that defendant ENGLANDER had received casino chips from
24  Businessperson A, but that defendant ENGLANDER had returned those
25  chips after gambling.   Defendant ENGLANDER agreed to call
26  Businessperson A after defendant ENGLANDER's interview with the FBI.

27          d.   On October 19, 2017, defendant ENGLANDER, with defense
28  counsel present, was interviewed by the FBI and USAO regarding the

Federal Investigation, including the 2017 Las Vegas trip and his
interactions with Businessperson A (the "first interview").
Defendant ENGLANDER declined to have the FBI record the interview.
During this interview, after being advised it was a crime to lie to
the federal government, defendant ENGLANDER falsely stated on
multiple occasions that, other than his lawyers and his wife,
defendant ENGLANDER had not informed anyone, including Businessperson
A, about his upcoming interview with the FBI.

        e.   On January 31, 2018, Businessperson A, acting at the
direction of law enforcement, contacted defendant ENGLANDER via
Confide.  Specifically, Businessperson A wrote: "Hi Councilman, I got
invite for your Feb/06th event, looking forward to seeing you, btw,
my attorney got call from FBI asking to follow up about the check."
Defendant ENGLANDER responded:  "Fantastic. See you then. I got a
call too. Very stupid. They are waiting [sic] their time with this."

        f.   On January 31, 2018 and February 1, 2018, defendant
ENGLANDER and Businessperson A, who was acting at the direction of
law enforcement, discussed the Federal Investigation via Confide.
During this exchange, defendant ENGLANDER asked: "What exactly are
they asking?"  After Businessperson A stated that the FBI was
interested in the Las Vegas reimbursement checks, Businessperson A
wrote: "If we talk about FBI stuff should [be] in person."  Defendant
ENGLANDER responded:  "That's why I suggested a different phone
number."  Defendant ENGLANDER then provided a different phone number,
and Businessperson A agreed to call that new phone number later that
evening.

        g.   On February 1, 2018, Businessperson A, acting at the
direction of law enforcement, left a voicemail message for defendant

ENGLANDER on the new phone number defendant ENGLANDER had provided to Businessperson A.

h.   Between February 2 and February 5, 2018, defendant ENGLANDER and Businessperson A, who was acting at the direction of law enforcement, exchanged messages via Confide.  During this exchange, they agreed to discuss the Federal Investigation at defendant ENGLANDER's fundraiser on February 6, 2018.

i.   During the fundraiser on February 6, 2018, defendant ENGLANDER and Businessperson A, who was acting at the direction of law enforcement, had a private conversation during which they discussed the Federal Investigation.  During this conversation:

i.   Defendant ENGLANDER instructed Businessperson A to falsely inform the FBI that defendant ENGLANDER and Businessperson A did not talk about their respective FBI interviews.  Specifically, defendant ENGLANDER told Businessperson A: "you and I have never had a conversation. . . . They are going to ask."

ii.   Defendant ENGLANDER instructed Businessperson A how to answer certain questions from the FBI, including: "you should just say 'I don't know.'"

iii. Defendant ENGLANDER instructed Businessperson A to falsely state that defendant ENGLANDER had repeatedly attempted to reimburse Businessperson A for defendant ENGLANDER's hotel room and dinner in Las Vegas.

iv.   Defendant ENGLANDER told Businessperson A not to tell the FBI anything about Businessperson A providing escort services to defendant ENGLANDER.  Specifically, regarding the "massage lady," defendant ENGLANDER instructed Businessperson A: "Don't say it. . . . Don't mention. . . . No, no, don't mention it."

v.   Defendant ENGLANDER agreed to meet Businessperson A after defendant ENGLANDER's FBI interview to discuss the interview.

j.   On February 7, 2018, at approximately 8:24 a.m. and 10:10 a.m., prior to defendant ENGLANDER's interview with the FBI that day, defendant ENGLANDER attempted to call Businessperson A via WhatsApp, an encrypted end-to-end messaging service that can also be used for phone calls.  In response, Businessperson A, at the direction of law enforcement, sent a message via WhatsApp to defendant ENGLANDER, writing: "sorry miss your call, but may not good ideal [sic] talk on the phone."  Defendant ENGLANDER responded: "Just a quick question."  Businessperson A then called defendant ENGLANDER via WhatsApp.  During the conversation, defendant ENGLANDER asked Businessperson A whether Businessperson A had told the FBI about the use of escorts during the June 2017 Las Vegas trip.  Businessperson A stated that he had not, to which defendant ENGLANDER responded: "[T]hat's what I wanted to confirm. . . . I appreciate it."

k.   On February 7, 2018, defendant ENGLANDER, with counsel present, was interviewed by the FBI and the USAO regarding the Federal Investigation, including the June 2017 Las Vegas trip and interactions with Businessperson A (the "second interview"). Defendant ENGLANDER declined to have the FBI record the interview. During the interview, after being advised it was a crime to lie to the federal government, defendant ENGLANDER made the following false statements:

i.   Defendant ENGLANDER falsely stated on multiple occasions that he was unaware that Businessperson A intended to attend defendant ENGLANDER's fundraiser the prior night.

ii.   Defendant ENGLANDER falsely stated that he and Businessperson A did not discuss the FBI, the Federal Investigation, or defendant ENGLANDER's upcoming FBI interview during the fundraiser.

iii. Defendant ENGLANDER falsely stated that he had never been told the amount of money Businessperson A paid at the nightclub for the bottle service and alcohol for the group during their June 2017 Las Vegas trip.

iv.   Defendant ENGLANDER falsely stated that Businessperson A did not provide defendant ENGLANDER benefits other than a hotel room, dinner, and beverage service during their June 2017 Las Vegas trip.

v.   Defendant ENGLANDER falsely stated he had no plans to discuss his FBI interview with anyone after it occurred.

l.   From February 8 to February 12, 2018, defendant ENGLANDER and Businessperson A, who was acting at the direction of law enforcement, exchanged messages via Confide.  Defendant ENGLANDER, under the pretense of helping Businessperson A obtain business, arranged for the two to meet on February 12, 2018.  On February 12, 2018, defendant ENGLANDER called Businessperson A to change the time and location of their meeting set for that day.

m.   On February 12, 2018, defendant ENGLANDER met with Businessperson A in defendant ENGLANDER's car in Downtown Los Angeles.  Once Businessperson A entered defendant ENGLANDER's car, defendant ENGLANDER told Businessperson A to "hold on," and turned on the stereo to play music at a very loud volume in an effort to obstruct possible listening devices.  Defendant ENGLANDER drove in circles and did not go to any specific location.  During this time,

14

defendant ENGLANDER and Businessperson A discussed the Federal Investigation and their FBI interviews.  Among other things:

    i.  Defendant ENGLANDER stated he did not "want to be out there in public" for their discussion.

    ii.  Defendant ENGLANDER repeatedly instructed Businessperson A to lie to the FBI and tell the FBI that he and Businessperson A did not have a conversation about their FBI interviews.  Specifically, defendant ENGLANDER told Businessperson A that the FBI "asked if you and I ever talked at all about the meeting with them.  We never had a conversation."  Defendant ENGLANDER further instructed Businessperson A regarding how to answer this topic of the two meeting to discuss the FBI interviews: "We never did, never did. . . . You don't mention it at all."

    iii. Defendant ENGLANDER told Businessperson A what questions the FBI would ask Businessperson A and how to answer them.  Specifically, defendant ENGLANDER stated, the FBI was going to "ask 'Did I ever contact you about how much we needed to reimbursement [sic].'  Just say, say, 'I don't remember.  We were trying to get together for a long time and he's busy and I'm busy, blah, blah.'"

    iv.  Defendant ENGLANDER repeatedly instructed Businessperson A how to respond to FBI questions about the use of escorts during the June 2017 Las Vegas trip.  Specifically, defendant ENGLANDER instructed Businessperson A to falsely tell the FBI: "if they check your phone records and called, just go, 'I called just to see how much money.' . . . . Say, 'I was so drunk I don't remember calling.' . . . . Or, 'I don't remember, maybe I dialed the wrong number, I don't know, I don't remember.' . . . . No, just say, 'I don't remember.'"

v.    Defendant ENGLANDER instructed Businessperson A to lie about their use of Confide.  Specifically, defendant ENGLANDER instructed Businessperson A: "No, no, we never had discussions. Nothing ever about Confide."

vi.   Defendant ENGLANDER instructed Businessperson A to lie to the FBI about their conversation at the fundraiser. Specifically, defendant ENGLANDER instructed Businessperson A to say Businessperson A "shook my hand and said hello.  That was it."

vii. Defendant ENGLANDER instructed Businessperson A that, if the FBI had checked their phone records regarding escort services during the June 2017 Las Vegas trip, to falsely tell the FBI: "'No, I didn't hire anybody.'"

viii.    At the conclusion of the conversation, defendant ENGLANDER agreed to introduce Businessperson A to defendant ENGLANDER's builder "friend," and defendant ENGLANDER agreed to tour Businessperson A's showroom.

n.    On or about April 2, 2018, defendant ENGLANDER reported $1,202 worth of gifts/benefits on his Form 700 for the year 2017, but did not report, among other things, the $15,000 cash he received from Businessperson A as a gift or benefit.

o.    On November 20, 2018, defendant ENGLANDER met with Businessperson A, who was acting at the direction of law enforcement. During this meeting, they discussed recent FBI actions regarding the Federal Investigation.  This discussion included:

i.    When Businessperson A referred to "the cash" that Businessperson A had provided to defendant ENGLANDER in the restroom in Las Vegas on or about June 1, 2017, defendant ENGLANDER stated, "I'm not going to say anything" to the FBI about it.

16

1        ii.   Defendant ENGLANDER agreed that Businessperson A
2   should omit that they talked about the content of their FBI
3   interviews during their meeting that day and instead falsely state
4   the discussion was about defendant ENGLANDER's new job.
5   Specifically, defendant ENGLANDER told Businessperson A: "They're
6   gonna say, 'When was the last time you talked [with defendant
7   ENGLANDER]?'"  Businessperson A responded: "I tell them the truth, we
8   were eating lunch."  Defendant ENGLANDER then stated: "I get it, I
9   get it.  Just catch up. . . . [A]bout the new job."

10        p.   On December 31, 2018, defendant ENGLANDER, with
11   defense counsel present, was interviewed by the FBI and USAO
12   regarding the Federal Investigation, including the June 2017 Las
13   Vegas trip and interactions with Businessperson A (the "third
14   interview").  Defendant ENGLANDER declined to have the FBI record the
15   interview.  During the third interview, after being advised that
16   lying to the federal government was a crime, defendant ENGLANDER made
17   the following false statements:

18        i.   When asked whether he received any benefits other
19   than casino chips (which he paid back), dinners, and a hotel room,
20   defendant ENGLANDER falsely responded, "Not that I recall."

21        ii.   Defendant ENGLANDER falsely stated that
22   Businessperson A never provided cash payments to defendant ENGLANDER.

23        iii. Defendant ENGLANDER falsely stated that he told
24   Businessperson A to "share everything, be transparent, and share
25   everything" with the FBI.

26        iv.   Defendant ENGLANDER falsely stated that he could
27   not recall if he had ever used Confide at all or, if he had, with
28   whom he had used it.

COUNT TWO

[18 U.S.C. § 1001(a)(2)]

32.   On or about October 19, 2017, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the FBI and USAO, defendant MITCHELL ENGLANDER knowingly and willfully made materially false statements and representations to the FBI and USAO knowing that these statements and representations were untrue.  Specifically, on multiple occasions, defendant ENGLANDER stated that, other than his lawyers and his wife, defendant ENGLANDER had not informed anyone, including Businessperson A, about his upcoming interview with the FBI.  In fact, as defendant ENGLANDER knew, on October 4, 2017, defendant ENGLANDER had repeatedly informed Businessperson A about his upcoming interview with the FBI.

COUNT THREE

[18 U.S.C. § 1512(b)(3)]

33.   On or about February 6, 2018, in Los Angeles County, within the Central District of California, defendant MITCHELL ENGLANDER, knowingly and with the intent to hinder, delay, and prevent the communication to law enforcement officers of information relating to the commission and possible commission of Federal offenses, namely: federal program bribery, in violation of Title 18, United States Code, Section 666; mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343; and making false statements, in violation of Title 18, United States Code, Section 1001, attempted to corruptly persuade Businessperson A by instructing Businessperson A to provide false and misleading information and omit relevant information during Businessperson A's interview with the FBI and USAO, including, but not limited to, instructing Businessperson A to:

a.   falsely state that defendant ENGLANDER and Businessperson A did not discuss the content of their FBI interviews with each other;

b.   falsely state that Businessperson A did not know facts relevant to the Federal Investigation that Businessperson A in fact knew;

c.   falsely state that defendant ENGLANDER had repeatedly attempted to reimburse Businessperson A for defendant ENGLANDER's hotel room and dinner in Las Vegas; and

d.   omit that defendant ENGLANDER and others had sought to utilize and had utilized a female escort or "massage lady" during the June 2017 Las Vegas trip.

COUNT FOUR

[18 U.S.C. § 1001(a)(2)]

34.  On or about February 7, 2018, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the USAO and FBI, defendant MITCHELL ENGLANDER knowingly and willfully made the following materially false statements and representations to the FBI and USAO knowing that these statements and representations were untrue:

    a.  Defendant ENGLANDER falsely stated that he was unaware that Businessperson A intended to attend defendant ENGLANDER's fundraiser the prior night.  In fact, as defendant ENGLANDER knew, on January 31, 2018 and February 5, 2018, via Confide conversations, defendant ENGLANDER and Businessperson A had confirmed that Businessperson A would attend the fundraiser.

    b.  Defendant ENGLANDER falsely stated that he and Businessperson A did not discuss, at the fundraiser or any other time, the FBI, the Federal Investigation, or defendant ENGLANDER's second interview.  In fact, as defendant ENGLANDER knew, the day prior to defendant ENGLANDER's second interview, he and Businessperson A had discussed the FBI, the Federal Investigation, and defendant ENGLANDER's second interview, including what questions to expect, what to say, and what not to say during upcoming FBI interviews.  Moreover, immediately prior to defendant ENGLANDER's interview that day, defendant ENGLANDER reached out to Businessperson A and spoke about the FBI and USAO interviews.

    c.  Defendant ENGLANDER falsely stated that he had never been told by Businessperson A the amount of money Businessperson A

20

paid at the nightclub for the bottle service and alcohol for the group during their June 2017 Las Vegas trip.  In fact, as defendant ENGLANDER knew, the day prior to defendant ENGLANDER's second interview, Businessperson A told defendant ENGLANDER that he had spent between approximately $20,000 and $25,000 at the nightclub for the group.

      d.   Defendant ENGLANDER falsely stated that Businessperson A did not provide defendant ENGLANDER benefits other than a hotel room, dinner, and beverage service during their Las Vegas trip.  In fact, as defendant ENGLANDER knew, Businessperson A did provide defendant ENGLANDER with the services of a female escort or "massage lady" during their Las Vegas trip and, the day prior to defendant ENGLANDER's second interview, the two had repeatedly discussed that topic.  Moreover, immediately prior to defendant ENGLANDER's interview that day, defendant ENGLANDER reached out to Businessperson A and spoke about escorts.

      e.   Defendant ENGLANDER falsely stated that he did not instruct anyone, including Businessperson A, what to say to the FBI.  In fact, as defendant ENGLANDER knew, the day prior to defendant ENGLANDER's second interview, he told Businessperson A, what questions to expect, what to say, and what not to say during upcoming FBI interviews.

      f.   Defendant ENGLANDER falsely stated that, other than his lawyers and his wife, he had not informed anyone about his second interview.  In fact, as defendant ENGLANDER knew, on February 6, 2018, defendant ENGLANDER had repeatedly informed Businessperson A about defendant ENGLANDER's second interview.

g.    Defendant ENGLANDER falsely stated that had no plans to discuss his second interview with anyone after it occurred.   In fact, as defendant ENGLANDER knew, the day prior to defendant ENGLANDER's second interview, he planned to meet with Businessperson A to discuss defendant ENGLANDER's second interview after it occurred.

COUNT FIVE

[18 U.S.C. § 1512(b)(3)]

35.   On or about February 12, 2018, in Los Angeles County, within the Central District of California, defendant MITCHELL ENGLANDER, knowingly and with the intent to hinder, delay, and prevent the communication to law enforcement officers of information relating to the commission and possible commission of Federal offenses, namely: federal program bribery, in violation of Title 18, United States Code, Section 666; mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343; and making false statements, in violation of Title 18, United States Code, Section 1001, attempted to corruptly persuade Businessperson A to provide false and misleading information and omit relevant information during Businessperson A's interview with the FBI and USAO, including, but not limited to, instructing Businessperson A to:

     a.   falsely state that defendant ENGLANDER and Businessperson A did not discuss the content of their FBI interviews with each other;

     b.   falsely state that defendant ENGLANDER had repeatedly attempted to reimburse Businessperson A for defendant ENGLANDER's hotel room and dinner in Las Vegas;

     c.   falsely state that Businessperson A did "not remember" relevant facts that Businessperson A in fact remembered;

     d.   falsely state the circumstances around Businessperson A providing the services of a female escort or "massage lady" to defendant ENGLANDER and others during the June 2017 Las Vegas trip; and

     e.   omit any information about their use of Confide.

COUNT SIX

[18 U.S.C. § 1512(b)(3)]

36.   On or about November 20, 2018, in Los Angeles County, within the Central District of California, defendant MITCHELL ENGLANDER, knowingly and with the intent to hinder, delay, and prevent the communication to law enforcement officers of information relating to the commission and possible commission of Federal offenses, namely, federal program bribery, in violation of Title 18, United States Code, Section 666; mail and wire fraud, in violation of Title 18, United States Code, Sections 1341 and 1343; and making false statements, in violation of Title 18, United States Code, Section 1001, attempted to corruptly persuade Businessperson A by encouraging Businessperson A to provide false and misleading information and omit relevant information during Businessperson A's interview with the USAO and FBI, including, but not limited to, by agreeing that Businessperson A should:

a.   omit that defendant ENGLANDER had ever received cash from Businessperson A; and

b.   falsely state that defendant ENGLANDER and Businessperson A had not discussed the FBI during their meeting that day.

24

COUNT SEVEN

[18 U.S.C. § 1001(a)(2)]

37.   On or about December 31, 2018, in Los Angeles County, within the Central District of California, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the USAO and FBI, defendant ENGLANDER knowingly and willfully made the following materially false statements and representations to the FBI and USAO knowing that these statements and representations were untrue:

a.   When asked whether he received any benefits other than casino chips (which he paid back), dinners, and a hotel room, defendant ENGLANDER falsely responded, "Not that I recall."  In fact, as defendant ENGLANDER knew, Businessperson A did provide defendant ENGLANDER with the services of a female escort or "massage lady" and $10,000 in cash during the 2017 Las Vegas trip.  Moreover, the two had several conversations about the "massage lady" Businessperson A provided during the 2017 Las Vegas trip.

b.   When asked whether Businessperson A ever provided cash or payments to him, defendant ENGLANDER falsely stated, "Not that I recall" and that "it would be something I would reject."  In fact, as defendant ENGLANDER knew, Businessperson A provided defendant ENGLANDER $10,000 cash in a bathroom during the June 2017 Las Vegas trip and $5,000 cash in a bathroom at the Palm Springs event for a total of $15,000 in 2017.

c.   Defendant ENGLANDER falsely stated that, during his November 20, 2018 meeting with Businessperson A, he told Businessperson A to "share everything, be transparent, and share everything" with the FBI.  In fact, as defendant ENGLANDER knew, he

25

did not provide such instructions and, instead, repeatedly agreed that Businessperson A should omit certain information.

        d.   When asked with whom he communicated using Confide, defendant ENGLANDER falsely stated "I do not remember" and he was "not sure if I ever used Confide." In fact, as defendant ENGLANDER knew, he had Confide registered to him on his phone at the time of the third interview and had recently used Confide to discuss relevant

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

matters with Businessperson A and Lobbyist B.   Moreover, on February 12, 2018, defendant ENGLANDER had instructed Businessperson A to lie to the FBI about their use of Confide.


A TRUE BILL


/s/
_____
Foreperson


NICOLA T. HANNA
United States Attorney

*Brandon Fox*

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

MACK E. JENKINS
Assistant United States Attorney
Chief, Public Corruption and
   Civil Rights Section

VERONICA DRAGALIN
Assistant United States Attorney
Public Corruption and Civil
   Rights Section

MELISSA MILLS
Assistant United States Attorney
Public Corruption and Civil
   Rights Section