NICOLA T. HANNA
United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No.242101)
VERONICA DRAGALIN (Cal. Bar No. 281370)
MELISSA MILLS (Cal. Bar No. 248529)
Assistant United States Attorney
Public Corruption and Civil Rights Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-2091
        Facsimile: (213) 894-2927
        Email:     mack.jenkins@usdoj.gov
                   veronica.dragalin@usdoj.gov
                   melissa.mills@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-CR-35-JFW |
|---|---|
| Plaintiff, | PLEA AGREEMENT FOR DEFENDANT MITCHELL ENGLANDER |
| v. | |
| MITCHELL ENGLANDER, | |
| Defendant. | |

1.   This constitutes the plea agreement between MITCHELL ENGLANDER ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authorities.

                    DEFENDANT'S OBLIGATIONS

2.   Defendant agrees to:

a.   At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to count one of the indictment in <u>United States v. Mitchell Englander</u>, No. 20-CR-35-JFW, which charges defendant with a scheme to falsify material facts, in violation of 18 U.S.C. § 1001(a)(1).

b.   Not contest the Factual Basis agreed to in this agreement.

c.   Abide by all agreements regarding sentencing contained in this agreement.

d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

g.   Pay the applicable special assessment at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

<u>THE USAO'S OBLIGATIONS</u>

3.   The USAO agrees to:

a.   Not contest the Factual Basis agreed to in this agreement.

b.   Abide by all agreements regarding sentencing contained in this agreement.

c.   At the time of sentencing, move to dismiss the remaining counts of the indictment as against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

d.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offense up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

e.   Not seek a sentence of imprisonment above 36 months of imprisonment.

## NATURE OF THE OFFENSE

4.   Defendant understands that for defendant to be guilty of the crime charged in count one, that is, a scheme to falsify material facts, in violation of Title 18, United States Code, Section 1001(a)(1), the following must be true: (1) defendant had a duty to disclose material information; (2) defendant falsified, concealed, or covered up such a fact by trick, scheme, or fraud; (3) the falsified, concealed, or covered up fact was material; (4) the falsification and/or concealment was knowing and willful; and (5) the material fact was within the jurisdiction of the Executive Branch.

## PENALTIES

5.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1001, is: 5 years of imprisonment; a 3-year period of

supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6.   Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

7.   Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition.  Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license.  Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

<u>FACTUAL BASIS</u>

8.   Defendant admits that defendant is, in fact, guilty of the offense to which defendant is agreeing to plead guilty.  Defendant

4

and the USAO agree to the statement of facts set forth in Attachment A and agree that this statement of facts is sufficient to support a plea of guilty to the charge described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 10 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

<u>SENTENCING FACTORS</u>

9.   Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crime of conviction.

10.  Except as set forth in paragraph 3(d) and 3(e) above, defendant and the USAO have no agreement as to the appropriate sentence or the applicable Sentencing Guidelines factors.  Except as set forth in paragraph 3(d) and 3(e), both parties reserve the right to argue for any criminal history score and category, base offense level, specific offense characteristics, adjustments, departures, and variances.

11.   Consistent with paragraph 3, defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7). Specifically, defendant reserves the right to argue for a sentence of probation.

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

12.   Defendant understands that by pleading guilty, defendant gives up the following rights:

a.   The right to persist in a plea of not guilty.

b.   The right to a speedy and public trial by jury.

c.   The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

d.   The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.   The right to confront and cross-examine witnesses against defendant.

f.   The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.   The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.   Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

<u>WAIVER OF APPEAL OF CONVICTION</u>

13.   Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty plea was involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's conviction on the offense to which defendant is pleading guilty.   Defendant understands that this waiver includes, but is not limited to, arguments that the statute to which defendant is pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's plea of guilty.

<u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

14.   Defendant agrees that, provided the Court imposes a total term of imprisonment on all counts of conviction of no more than 36 months of imprisonment, defendant gives up the right to appeal all of the following: (a) the procedures and calculations used to determine and impose any portion of the sentence; (b) the term of imprisonment imposed by the Court; (c) the fine imposed by the Court, provided it is within the statutory maximum; (d) to the extent permitted by law, the constitutionality or legality of defendant's sentence, provided it is within the statutory maximum; (e) the term of probation or supervised release imposed by the Court, provided it is within the statutory maximum; and (f) any of the following conditions of probation or supervised release imposed by the Court: the conditions set forth in General Order 18-10 of this Court; the drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and 3583(d).

15.   The USAO agrees that, provided all portions of the sentence are at or below the statutory maximum specified above and the Court imposes a term of imprisonment within or above the range corresponding to an offense level of 15 and the criminal history category calculated by the Court, the USAO gives up its right to appeal any portion of the sentence.

RESULT OF WITHDRAWAL OF GUILTY PLEA

16.   Defendant agrees that if, after entering a guilty plea pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty plea on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

RESULT OF VACATUR, REVERSAL OR SET-ASIDE

17.   Defendant agrees that if the count of conviction is vacated, reversed, or set aside, both the USAO and defendant will be released from all their obligations under this agreement.

### EFFECTIVE DATE OF AGREEMENT

18.   This agreement is effective upon signature and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney.

### BREACH OF AGREEMENT

19.   Defendant agrees that if defendant, at any time after the signature of this agreement and execution of all required certifications by defendant, defendant's counsel, and an Assistant United States Attorney, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  All of defendant's obligations are material, a single breach of this agreement is sufficient for the USAO to declare a breach, and defendant shall not be deemed to have cured a breach without the express agreement of the USAO in writing. If the USAO declares this agreement breached, and the Court finds such a breach to have occurred, then: (a) if defendant has previously entered a guilty plea pursuant to this agreement, defendant will not be able to withdraw the guilty plea, and (b) the USAO will be relieved of all its obligations under this agreement.

20.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any

speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.    Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

21.  Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing recommendations or the parties' agreements to facts or sentencing factors.

22.  Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it

chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 10 are consistent with the facts of this case.  This paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the Factual Basis agreed to in this agreement.

23.  Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty plea, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

<u>NO ADDITIONAL AGREEMENTS</u>

24.  Defendant understands that, except as set forth herein, there are no promises, understandings, or agreements between the USAO and defendant or defendant's attorney, and that no additional promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

//
//
//
//
//

11

1      <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

2         25.  The parties agree that this agreement will be considered

3   part of the record of defendant's guilty plea hearing as if the

4   entire agreement had been read into the record of the proceeding.

5   AGREED AND ACCEPTED

6   UNITED STATES ATTORNEY'S OFFICE
    FOR THE CENTRAL DISTRICT OF
7   CALIFORNIA

8   NICOLA T. HANNA
    United States Attorney

9

10  _____        3/25/2020
    MACK E. JENKINS                        Date
11  VERONICA DRAGALIN
    MELISSA MILLS
12  Assistant United States Attorneys

13

14
    _____        March 25, 2020
15  MITCHELL ENGLANDER                     Date
    Defendant
16

17

18  _____        Mar 25, 2020
    JANET LEVINE                           Date
19  Attorney for Defendant
    MITCHELL ENGLANDER
20

21

22

23

24

25

26

27

28

                    12

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

MITCHELL ENGLANDER                    March 25, 2020
Defendant                             Date

13

## CERTIFICATION OF DEFENDANT'S ATTORNEY

I am MITCHELL ENGLANDER's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of a guilty plea pursuant to this agreement.

Janet Levine (Mar 25, 2020)

_____

JANET LEVINE
Attorney for Defendant MITCHELL
ENGLANDER

Mar 25, 2020

Date

14

**ATTACHMENT A**

FACTUAL BASIS

1.    The Federal Bureau of Investigation ("FBI") in Los Angeles and the United States Attorney's Office ("USAO") for the Central District of California were conducting a federal criminal investigation into public corruption throughout the City of Los Angeles (the "City") related to multiple suspected "pay-to-play" schemes (the "Federal Investigation").  The Federal Investigation involved multiple City officials, developers, investors, consultants, lobbyists, and other close associates working in furtherance of the potentially illegal schemes.

2.    Defendant MITCHELL ENGLANDER was the councilmember for Council District 12 in the San Fernando Valley from 2011 until he resigned on December 31, 2018 with almost two years remaining on his "extended" term.  Defendant ENGLANDER served as the Council President Pro-Tempore and was on the Planning and Land Use Management ("PLUM") Committee until his resignation from City Council in December 2018. While a councilmember, defendant ENGLANDER also served on other various City committees, including as the Chair of the Public Safety Committee, member of the Budget and Finance Committee, the Personnel and Animal Welfare Committee, the Executive Employee Relations Committee, the ad-hoc Police Reform Committee, and Board of Referred Powers.  Defendant ENGLANDER was also a reserve member of the Los Angeles Police Department.

**June 2017 Las Vegas Trip**

3.    On June 1, 2017, defendant ENGLANDER traveled to Las Vegas with, among others, Businessperson A, City Staffer A, City Staffer B, Lobbyist A, and Developer A (the "June 2017 Las Vegas trip").

DEFT. INITIALS _M.Englander_                    1

1  Businessperson A provided defendant ENGLANDER, City Staffer A, City
2  Staffer B, and others with hotel rooms at a resort and casino (the
3  "Resort and Casino").  Specifically, Businessperson A provided them
4  use of Businessperson A's "comps," which were hotel-provided
5  amenities ordinarily limited to VIP customers who, like
6  Businessperson A, were typically provided such status because of the
7  amount of money that customer had provided the hotel in the past and
8  in order to incentivize further business.  Defendant ENGLANDER was
9  provided transportation from the Las Vegas airport to the Resort and
10 Casino.
11      4.   On June 1, 2017, defendant ENGLANDER accepted an envelope
12 containing $10,000 in cash from Businessperson A in the Resort and
13 Casino's bathroom.  That same day, Businessperson A, in front of the
14 group, provided defendant ENGLANDER and the rest of the group casino
15 chips with which to gamble.  Businessperson A provided defendant
16 ENGLANDER approximately $1,000 in casino chips.  After defendant
17 ENGLANDER finished gambling, he, in front of the group, returned the
18 casino chips to Businessperson A.   Later that evening,
19 Businessperson A provided dinner and drinks for defendant ENGLANDER,
20 City Staffer A, City Staffer B, Lobbyist A, Developer A, and others
21 at a restaurant inside the Resort and Casino.  Businessperson A was
22 charged approximately $2,481 for the dinner and drinks for the group.
23 Thereafter, defendant ENGLANDER, Businessperson A, City Staffer A,
24 City Staffer B, Lobbyist A, and Developer A took a limousine provided
25 by the Resort and Casino to a nightclub at another hotel (the
26 "nightclub").  At the nightclub, Businessperson A paid approximately
27 $24,000 for bottle service and alcohol for defendant ENGLANDER,
28 Businessperson A, City Staffer A, City Staffer B, Lobbyist A,

DEFT. INITIALS _____          2

1    Developer A, and others at the nightclub.  Developer A paid another
2    approximately $10,000 for bottle service and alcohol for the group
3    and others at the nightclub.

4       5.    After the group returned to the Resort and Casino in the
5    early morning of June 2, 2017, Businessperson A told defendant
6    ENGLANDER that Businessperson A was going to order female escorts for
7    the group to come to their hotel.  When two escorts arrived to the
8    Resort and Casino, Businessperson A paid for their services and
9    sometime later instructed one of the escorts to go to defendant
10   ENGLANDER's hotel room to provide him with services.  Businessperson
11   A was unaware if defendant ENGLANDER accepted those services.

12   **Palm Springs Event and Lunch**

13      6.    From on or about June 10 through June 12, 2017, defendant
14   ENGLANDER attended a golf tournament at the Morongo Casino Resort and
15   Spa in Palm Springs, California (the "Palm Springs event").  On or
16   about June 12, 2017, at the Palm Springs event, defendant ENGLANDER
17   accepted an envelope containing $5,000 in cash from Businessperson A
18   in a casino bathroom.

19      7.    On June 19, 2017, at Businessperson A's request,
20   approximately one week after the Palm Springs event, defendant
21   ENGLANDER arranged for Businessperson A, Developer B, and defendant
22   ENGLANDER to have lunch so that Businessperson A could present his
23   company and product to Developer B.  After the lunch on June 19,
24   2017, Developer B sent defendant ENGLANDER and Businessperson A an
25   email thanking Businessperson A for lunch and seeking to set up a
26   further meeting and "presentation" from Businessperson A.

27

28

DEFT. INITIALS _____          3

**Defendant ENGLANDER's Scheme**

8.    From in or about August 2017, to on or about December 31, 2018, in a matter within the jurisdiction of the executive branch of the government of the United States, namely, the USAO and FBI, defendant ENGLANDER knowingly and willfully falsified, concealed, and covered up by trick, scheme, and device material facts, namely that: (a) defendant ENGLANDER had accepted from Businessperson A items of value, such as cash payments, hotel rooms, luxury outings, and expensive meals and had been offered escort services; (b) defendant ENGLANDER had attempted to coordinate statements he made to the FBI and USAO with Businessperson A; and (c) defendant ENGLANDER had counseled Businessperson A how to lie to and mislead the FBI and USAO.  Defendant ENGLANDER carried out the scheme, in substance, in the following manner:

9.    After learning about the Federal Investigation, in or around August 2017, defendant ENGLANDER privately sent an encrypted message to Businessperson A via Confide.  Defendant ENGLANDER stated in his message that he wanted to reimburse Businessperson A for portions of the June 2017 Las Vegas trip.

10.    After the FBI contacted defendant ENGLANDER on or about September 1, 2017, to seek a voluntary interview with him regarding an ongoing investigation, defendant ENGLANDER sent a check payable to Businessperson A to reimburse him for certain expenses related to their Las Vegas trip.  Defendant ENGLANDER dated the check August 4, 2017, before the FBI contacted defendant ENGLANDER, but sent the check after the FBI requested an interview with defendant ENGLANDER.

11.    On October 4, 2017, defendant ENGLANDER met Businessperson A for lunch in Downtown Los Angeles.  During the lunch, defendant

DEFT. INITIALS _____        4

1  ENGLANDER and Businessperson A discussed the June 2017 Las Vegas trip

2  and the Federal Investigation, including that Businessperson A had

3  been interviewed and their understanding that City Staffer A and City

4  Staffer B also had been interviewed by the FBI.  Defendant ENGLANDER

5  told Businessperson A that he had an upcoming interview with the FBI;

6  he further stated that City Staffer B told defendant ENGLANDER to

7  tell the FBI that defendant ENGLANDER had received casino chips from

8  Businessperson A, but that defendant ENGLANDER had returned those

9  chips after gambling.  Defendant ENGLANDER agreed to call

10 Businessperson A after defendant ENGLANDER's interview with the FBI.

11     12.  On October 19, 2017, defendant ENGLANDER, with defense

12 counsel present, was interviewed by the FBI and USAO regarding the

13 Federal Investigation, including the 2017 Las Vegas trip and his

14 interactions with Businessperson A (the "first interview").  During

15 this interview, after being advised it was a crime to lie to the

16 federal government, defendant ENGLANDER falsely stated, on more than

17 one occasion, that, other than his lawyers and his wife, defendant

18 ENGLANDER had not informed anyone, including Businessperson A, about

19 his upcoming interview with the FBI.  In fact, as defendant ENGLANDER

20 knew, on October 4, 2017, defendant ENGLANDER had repeatedly informed

21 Businessperson A about his upcoming interview with the FBI.

22     13.  On January 31, 2018, Businessperson A contacted defendant

23 ENGLANDER via Confide.  Specifically, Businessperson A wrote: "Hi

24 Councilman, I got invite for your Feb/06th event, looking forward to

25 seeing you, btw, my attorney got call from FBI asking to follow up

26 about the check."  Defendant ENGLANDER responded:  "Fantastic. See

27 you then. I got a call too. Very stupid. They are waiting [sic] their

28 time with this."

DEFT. INITIALS _M.Englander_          5

14. On January 31, 2018 and February 1, 2018, defendant ENGLANDER and Businessperson A discussed the Federal Investigation via Confide. During this exchange, defendant ENGLANDER asked: "What exactly are they asking?" After Businessperson A stated that the FBI was interested in the Las Vegas reimbursement checks, Businessperson A wrote: "If we talk about FBI stuff should [be] in person." Defendant ENGLANDER responded: "That's why I suggested a different phone number." Defendant ENGLANDER then provided a different phone number, and Businessperson A agreed to call that new phone number later that evening.

15. On February 1, 2018, Businessperson A left a voicemail message for defendant ENGLANDER on the new phone number defendant ENGLANDER had provided to Businessperson A.

16. Between February 2 and February 5, 2018, defendant ENGLANDER and Businessperson A exchanged messages via Confide. During this exchange, they agreed to discuss the Federal Investigation at defendant ENGLANDER's fundraiser on February 6, 2018.

17. During the fundraiser on February 6, 2018, defendant ENGLANDER and Businessperson A had a private conversation during which they discussed the Federal Investigation. During this conversation:

a. Defendant ENGLANDER told Businessperson A to falsely inform the FBI that defendant ENGLANDER and Businessperson A did not talk about their respective FBI interviews. Specifically, defendant ENGLANDER told Businessperson A: "you and I have never had a conversation. . . . They are going to ask."

DEFT. INITIALS _____ 6

b.   Defendant ENGLANDER told Businessperson A how to answer certain questions from the FBI, including: "you should just say 'I don't know.'"

c.   Defendant ENGLANDER told Businessperson A to falsely state that defendant ENGLANDER had repeatedly attempted to reimburse Businessperson A for defendant ENGLANDER's hotel room and dinner in Las Vegas.

d.   Defendant ENGLANDER told Businessperson A not to tell the FBI anything about Businessperson A providing escort services or "massage ladies" to defendant ENGLANDER. Specifically, regarding the "massage lady," defendant ENGLANDER told Businessperson A: "Don't say it. . . . Don't mention. . . . No, no, don't mention it."

e.   Defendant ENGLANDER agreed to meet Businessperson A after defendant ENGLANDER's FBI interview to discuss the interview.

18. On February 7, 2018, at approximately 8:24 a.m. and 10:10 a.m., prior to defendant ENGLANDER's interview with the FBI that day, defendant ENGLANDER attempted to call Businessperson A via WhatsApp, an encrypted end-to-end messaging service that can also be used for phone calls. In response, Businessperson A sent a message via WhatsApp to defendant ENGLANDER, writing: "sorry miss your call, but may not good ideal [sic] talk on the phone." Defendant ENGLANDER responded: "Just a quick question." Businessperson A then called defendant ENGLANDER via WhatsApp. During the conversation, defendant ENGLANDER asked Businessperson A whether Businessperson A had told the FBI about the use of escorts during the June 2017 Las Vegas trip. Businessperson A stated that he had not, to which defendant ENGLANDER responded: "[T]hat's what I wanted to confirm. . . . I appreciate it."

DEFT. INITIALS _____                    7

19.   On February 7, 2018, defendant ENGLANDER, with counsel present, was interviewed by the FBI and the USAO regarding the Federal Investigation, including the June 2017 Las Vegas trip and interactions with Businessperson A (the "second interview").   During the interview, after being advised it was a crime to lie to the federal government, defendant ENGLANDER made the following false statements:

a.   Defendant ENGLANDER falsely stated, on more than one occasion, that he was unaware that Businessperson A intended to attend defendant ENGLANDER's fundraiser the prior night.   In fact, as defendant ENGLANDER knew, on January 31, 2018 and February 5, 2018, via Confide conversations, defendant ENGLANDER and Businessperson A had confirmed that Businessperson A would attend the fundraiser.

b.   Defendant ENGLANDER falsely stated that he and Businessperson A did not discuss the FBI, the Federal Investigation, or defendant ENGLANDER's upcoming FBI interview during the fundraiser.   In fact, as defendant ENGLANDER knew, the day prior to defendant ENGLANDER's second interview, he and Businessperson A had discussed the FBI, the Federal Investigation, and defendant ENGLANDER's second interview, including what questions to expect, what to say, and what not to say during upcoming FBI interviews. Moreover, immediately prior to defendant ENGLANDER's interview that day, defendant ENGLANDER reached out to Businessperson A and spoke about the FBI and USAO interviews.

c.   Defendant ENGLANDER falsely stated that he had never been told the amount of money Businessperson A paid at the nightclub for the bottle service and alcohol for the group during their June 2017 Las Vegas trip.   In fact, as defendant ENGLANDER knew, the day

DEFT. INITIALS _____   8

prior to defendant ENGLANDER's second interview, Businessperson A told defendant ENGLANDER that he had spent between approximately $20,000 and $25,000 at the nightclub for the group.

d.   Defendant ENGLANDER falsely stated that Businessperson A did not provide defendant ENGLANDER benefits other than a hotel room, dinner, and beverage service during their June 2017 Las Vegas trip.  In fact, as defendant ENGLANDER knew, Businessperson A did offer defendant ENGLANDER the services of a female escort or "massage lady" during their Las Vegas trip and, the day prior to defendant ENGLANDER's second interview, the two had repeatedly discussed that topic.  Moreover, immediately prior to defendant ENGLANDER's interview that day, defendant ENGLANDER reached out to Businessperson A and they spoke about escorts.

e.   Defendant ENGLANDER falsely stated that he did not tell anyone, including Businessperson A, what to say to the FBI.  In fact, as defendant ENGLANDER knew, the day prior to defendant ENGLANDER's second interview, he told Businessperson A, what questions to expect, what to say, and what not to say during upcoming FBI interviews.

f.   Defendant ENGLANDER falsely stated that, other than his lawyers and his wife, he had not informed anyone about his second interview.  In fact, as defendant ENGLANDER knew, on February 6, 2018, defendant ENGLANDER, on more than one occasion, informed Businessperson A about defendant ENGLANDER's second interview.

g.   Defendant ENGLANDER falsely stated that he had no plans to discuss his second interview with anyone after it occurred. In fact, as defendant ENGLANDER knew, the day prior to defendant ENGLANDER's second interview, he planned to meet with Businessperson

DEFT. INITIALS _____      9

1  A to discuss defendant ENGLANDER's second interview after it

2  occurred.

3      20.  From February 8 to February 12, 2018, defendant ENGLANDER

4  and Businessperson A exchanged messages via Confide.  Defendant

5  ENGLANDER arranged for the two to meet on February 12, 2018.  On

6  February 12, 2018, defendant ENGLANDER called Businessperson A to

7  change the time and location of their meeting set for that day.

8      21.  On February 12, 2018, defendant ENGLANDER met with

9  Businessperson A in defendant ENGLANDER's car in Downtown Los

10  Angeles.  Once Businessperson A entered defendant ENGLANDER's car,

11  defendant ENGLANDER told Businessperson A to "hold on," then turned

12  up the car stereo to a very loud volume.  Defendant ENGLANDER drove

13  in circles around the block and did not go to any specific location.

14  During this time, defendant ENGLANDER and Businessperson A discussed

15  the Federal Investigation and their FBI interviews.  Among other

16  things:

17      a.  Defendant ENGLANDER stated he did not "want to be out

18  there in public" for their discussion.

19      b.  Defendant ENGLANDER repeatedly told Businessperson A

20  to tell the FBI that he and Businessperson A did not have a

21  conversation about their FBI interviews.  Specifically, defendant

22  ENGLANDER told Businessperson A that the FBI "asked if you and I ever

23  talked at all about the meeting with them.  We never had a

24  conversation."  Defendant ENGLANDER further told Businessperson A how

25  to respond to questions regarding the topic of the two meeting to

26  discuss the FBI interviews:  "We never did, never did. . . . You don't

27  mention it at all."

28

DEFT. INITIALS _____          10

1        c.    Defendant ENGLANDER told Businessperson A what

2  questions the FBI would ask Businessperson A and how to answer them.

3  Specifically, defendant ENGLANDER stated, the FBI was going to "ask

4  'Did I ever contact you about how much we needed to reimbursement

5  [sic].' Just say, say, 'I don't remember. We were trying to get

6  together for a long time and he's busy and I'm busy, blah, blah.'"

7        d.    Defendant ENGLANDER repeatedly told Businessperson A

8  how to respond to FBI questions about the use of escorts during the

9  June 2017 Las Vegas trip. Specifically, defendant ENGLANDER told

10 Businessperson A to falsely tell the FBI: "if they check your phone

11 records and called, just go, 'I called just to see how much money.' .

12 . . . Say, 'I was so drunk I don't remember calling.' . . . . Or, 'I

13 don't remember, maybe I dialed the wrong number, I don't know, I

14 don't remember.' . . . . No, just say, 'I don't remember.'"

15       e.    Defendant ENGLANDER told Businessperson A not to

16 disclose their use of Confide. Specifically, defendant ENGLANDER

17 told Businessperson A: "No, no, we never had discussions. Nothing

18 ever about Confide."

19       f.    Defendant ENGLANDER told Businessperson A not to

20 disclose their conversation at the fundraiser. Specifically,

21 defendant ENGLANDER told Businessperson A to say Businessperson A

22 "shook my hand and said hello. That was it."

23       g.    Defendant ENGLANDER told Businessperson A that, if the

24 FBI had checked their phone records regarding escort services during

25 the June 2017 Las Vegas trip, to falsely tell the FBI: "'No, I didn't

26 hire anybody.'"

27       h.    At the conclusion of the conversation, defendant

28 ENGLANDER agreed to introduce Businessperson A to defendant

DEFT. INITIALS _H. Englander_        11

1   ENGLANDER's builder "friend," and defendant ENGLANDER agreed to tour

2   Businessperson A's showroom.

3       22.   On or about April 2, 2018, defendant ENGLANDER reported

4   $1,202 worth of gifts/benefits on his Form 700 for the year 2017, but

5   did not report, among other things, the $15,000 cash he received from

6   Businessperson A as a gift or benefit.

7       23.   On November 20, 2018, defendant ENGLANDER met with

8   Businessperson A.   During this meeting, they discussed recent FBI

9   actions regarding the Federal Investigation.   This discussion

10  included:

11          a.   When Businessperson A referred to "the cash" that

12  Businessperson A had provided to defendant ENGLANDER in the casino

13  restroom in Las Vegas on or about June 1, 2017, defendant ENGLANDER

14  stated, "I'm not going to say anything" to the FBI about it.

15          b.   Defendant ENGLANDER agreed that Businessperson A

16  should omit that they talked about the content of their FBI

17  interviews during their meeting that day and instead state the

18  discussion was about defendant ENGLANDER's new job.   Specifically,

19  defendant ENGLANDER told Businessperson A: "They're gonna say, 'When

20  was the last time you talked [with defendant ENGLANDER]?'"

21  Businessperson A responded: "I tell them the truth, we were eating

22  lunch."   Defendant ENGLANDER then stated: "I get it, I get it.   Just

23  catch up. . . . [A]bout the new job."

24      24.   On December 31, 2018, defendant ENGLANDER, with defense

25  counsel present, was interviewed by the FBI and USAO regarding the

26  Federal Investigation, including the June 2017 Las Vegas trip and

27  interactions with Businessperson A (the "third interview").   During

28  the third interview, after being advised that lying to the federal

DEFT. INITIALS _____        12

1 | government was a crime, defendant ENGLANDER made the following false
2 | statements:

3 |         a.    When asked whether he received any benefits other than
4 | casino chips (which he paid back), dinners, and a hotel room,
5 | defendant ENGLANDER falsely responded, "Not that I recall."  In fact,
6 | as defendant ENGLANDER knew, Businessperson A provided $10,000 in
7 | cash and offered defendant ENGLANDER the services of a female escort
8 | or "massage lady" during the 2017 Las Vegas trip.  Moreover, the two
9 | had several conversations about the "massage lady" Businessperson A
10 | offered during the 2017 Las Vegas trip.

11 |         b.    Defendant ENGLANDER falsely stated that Businessperson
12 | A never provided cash payments to defendant ENGLANDER.  In fact, as
13 | defendant ENGLANDER knew, Businessperson A provided defendant
14 | ENGLANDER $10,000 cash in a casino bathroom during the June 2017 Las
15 | Vegas trip and $5,000 cash in a casino bathroom at the Palm Springs
16 | event for a total of $15,000 in 2017.

17 |         c.    Defendant ENGLANDER falsely stated that he told
18 | Businessperson A to "share everything, be transparent, and share
19 | everything" with the FBI.  In fact, as defendant ENGLANDER knew, he
20 | did not provide such instructions and, instead, repeatedly agreed
21 | that Businessperson A should omit certain information.

22 |         d.    Defendant ENGLANDER falsely stated that he could not
23 | recall if he had ever used Confide at all or, if he had, with whom he
24 | had used it.  In fact, as defendant ENGLANDER knew, he had Confide
25 | registered to him on his phone at the time of the third interview and
26 | had recently used Confide to discuss matters with Businessperson A
27 | and Lobbyist B.  Moreover, on February 12, 2018, defendant ENGLANDER
28 | told Businessperson A not to disclose their use of Confide.

DEFT. INITIALS _____      13