KENDALL BRILL & KELLY LLP
Janet I. Levine (94255)
 *jlevine@kbkfirm.com*
Sarah E. Moses (291491)
 *smoses@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile:  310.556.2705

Attorneys for Defendant
Mitchell Englander

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MITCHELL ENGLANDER,<br><br>Defendant. | Case No. CR 20-35-JFW<br><br>**DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING**<br><br>*Filed Concurrently with Declaration of Janet I. Levine and Exhibits*<br><br>Judge:   John F. Walter<br>Date:    January 25, 2021<br>Time:    8:00 a.m.<br>Crtrm.:  7A |

# REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.      INTRODUCTION .................................................................................. 1

II.     PROCEDURAL POSTURE ................................................................... 1

III.    THE PLEA AND PLEA AGREEMENT ................................................ 4

IV.     OBJECTIONS, CORRECTIONS, AND ADDITIONS TO THE
        PRESENTENCE INVESTIGATION REPORT ...................................... 5

V.      GUIDELINE ANALYSIS ...................................................................... 5

        A.    The Presentence Investigation Report ....................................... 5

        B.    Mr. Englander's Guideline Position .......................................... 5

        C.    The Government's Guideline Analysis is Flawed ....................... 8

VI.     A SENTENCE OF PROBATION IS THE JUST AND
        APPROPRIATE SENTENCE ................................................................. 8

        A.    Legal Standard ......................................................................... 8

        B.    Nature and Circumstances of the Instant False Statement Offense ........ 9

              1.    Overview ......................................................................... 9

              2.    Mr. Englander's False Statement Offense is Not Part of
                    the Alleged Offenses/Indictment of Mr. Huizar and His
                    Co-Defendants .............................................................. 12

              3.    Mr. Englander's Relationships With Businessperson A
                    Did Not Involve Any City Business ............................... 13

              4.    Mr. Englander Has Fully Accepted Responsibility for His
                    Conduct ........................................................................ 13

        C.    Mr. Englander's History and Personal Characteristics Support
              Probation:  He Is A Giving, Caring, and Exemplary Family Man
              and Citizen, Working Hard to Have a Positive Impact On The
              Community ............................................................................ 15

              1.    Mr. Englander's Early Years Were Difficult; Through
                    Community, He Was Able To Overcome Great Challenges...... 15

              2.    Mr. Englander Possesses an Industrious Spirit and Began
                    Working at a Young Age ................................................ 18

              3.    Mr. and Mrs. Englander Devoted Their Young Adult
                    Years to Building Family, Building Community, and
                    Performing Good Works In The Community ..................... 19

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

(a)     Mr. Englander as a Family Man ..................................... 20

(b)     Mr. Englander's Community Involvement and
Public Service Are Deep, Substantial, and
Significant ........................................................................ 22

(c)     Mr. Englander's Service as a Reserve LAPD Officer ...... 24

4.     Mr. Englander's Service as the Chief of Staff to a Council
Member and as a Council Member Enhanced the City of
Los Angeles ............................................................................ 26

(a)     Work as Chief of Staff for the 12th Council District ....... 26

(b)     Providing a Role Model for Those With Whom He
Worked ............................................................................. 29

5.     Mr. Englander's City Council Service Had a Positive
Impact .................................................................................... 30

6.     Support Letters Provide a Fulsome View of Mr.
Englander's Lifetime of Hard Work and Service ...................... 32

D.     A Probation Sentence Provides Respect For The Law; It Will
Achieve Justice ............................................................................. 33

1.     Proper Respect For The Law ................................................... 33

2.     Mr. Englander Presents No Risk of Recidivism ........................ 34

(a)     Deterrence – Specific and General .................................. 34

(b)     Protection of the Public .................................................. 35

3.     Probation Provides Just Punishment ........................................ 35

VII.   CONCLUSION ................................................................................... 36

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Gall v. United States*,
   552 U.S. 38 (2007) ............................................................................... 36

*McDonnell v. United States*,
   136 S. Ct. 2355 (2016) ................................................................... 6, 10

*United States v. Booker*,
   543 U.S. 220 (2005) .............................................................................. 8

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) ................................................................ 8

*United States v. Dredd*,
   Case No. 19-50220, 2020 WL 6281513 (9th Cir. Oct. 27, 2020) ....................... 6

*United States v. Dredd*,
   Case No. 2:15-CR-569-DSF (C.D. Cal.) ............................................... 6

*United States v. Huizar, et al.*,
   Case No. 2:20-CR-326-JFW (C.D. Cal.) .......................................... 1, 2

*United States v. Flynn*,
   Case No. 1:17-CR-232 (D.D.C.) ..................................................... 3, 6

*United States v. Whitmore*,
   35 F. App'x 307 (9th Cir. 2002).......................................................... 36

**Federal Statutes**

18 U.S.C.
   § 1001 ....................................................................................*passim*
   § 1512 ............................................................................... 2, 3, 7
   § 3553(a).................................................................................. 8
   § 3553(a)(1) ........................................................................... 8
   § 3553(a)(2) ........................................................................ 1, 8
   § 3553(a)(2)(A)-(C) ................................................................ 9
   § 3553(a)(2)(D) ..................................................................... 37
   § 3553(a)(3) ........................................................................ 37

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Case No. CR 20-35-JFW

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

§ 3553(a)(6) .................................................................................................... 9

**Guidelines**

U.S.S.G.
  § 1B1.2(a) ...................................................................................................... 7
  § 2B1.1 ................................................................................................... 5, 6, 7
  § 2B1.1(a)(2) .................................................................................................. 7
  § 2B1.1(b)(1) ................................................................................................. 5
  § 2J1.2 ..................................................................................................... 6, 7, 8
  § 3B1.3 ........................................................................................................... 5
  § 3C1.1 ........................................................................................................... 5
  § 3E1.1 ....................................................................................................... 4, 5

**Other Authorities**

Bureau of Justice Statistics, Federal Criminal Case Processing
  Statistics, *available at* https://www.bjs.gov/fjsrc/tsec.cfm ............................... 35

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

## POSITION REGARDING SENTENCING

## I.   INTRODUCTION

Mitchell Englander, the sole defendant in a stand-alone "false statements" case, will appear before this Court on January 25, 2021 to be sentenced on his one-count plea of violating 18 U.S.C. § 1001.  As evidenced by his guilty plea and his letter to this Court, Mr. Englander has fully accepted responsibility for his misconduct.  Mr. Englander's conduct here is completely at odds with his lifetime of public service and law-abiding behavior.

The United States Probation Department, in the Presentence Investigation Report ("PSR") and its sentencing recommendation, recognizing Mr. Englander's life history and his acceptance of responsibility, recommends a sentence of probation, with a fine of $9,500, concluding that the "recommended sentence is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2)."

For the reasons set forth in the PSR and herein, including the nature and circumstances of Mr. Englander's offense, Mr. Englander's character and life history, and the objectives and purposes of sentencing, probation and a fine is the appropriate and just sentence.

## II.   PROCEDURAL POSTURE

In or around the late summer/early fall of 2017, Mitchell Englander was asked by federal law enforcement officers to voluntarily interview in connection with an ongoing federal investigation.  Mr. Englander was not the target of the investigation. It is now apparent that the investigation was focused on allegations of bribery in Los Angeles City politics, particularly targeting former Councilman Jose Huizar.[1]

---

[1] *See United States v. Huizar, et al.,* Case No. 2:20-CR-326-JFW (C.D. Cal.), Dkt. Nos. 36 (indictment) & 74 (first superseding indictment).

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

On October 19, 2017, Mr. Englander appeared at the United States Attorney's Office ("USAO") for the voluntary interview.  The interview was conducted over three sessions.  All three sessions were led by Assistant United States Attorney Mack Jenkins, the head of the USAO's public corruption section.  All three sessions were conducted under the same proffer agreement.  *See* Declaration of Janet I. Levine in Support of Defendant Mitchell Englander's Position Regarding Sentencing ("Levine Decl.") ¶¶ 2-3.  Before the first session, AUSA Jenkins advised counsel for Mr. Englander that Mr. Englander was viewed as a "witness" or a "subject" of the investigation; not a "target."  *Id*. ¶ 5.  Mr. Englander's sessions were conducted on October 19, 2017, February 7, 2018, and December 31, 2018.  Mr. Englander was obligated by statute and by the proffer agreement, as well as by the cannons of citizenship, to be truthful in the interview.  He was not.[2]  Instead, as set forth herein, when asked about events that were personally embarrassing, although ***not*** federal crimes, Mr. Englander was not truthful.  Significantly, the government never alleged any federal crime from the June 2017 actions that were the subject of the misstatements.

On January 16, 2020, Mr. Englander was indicted for violating 18 U.S.C. §§ 1001 and 1512, based on false statements made during the interview sessions.  The indictment was sealed and Mr. Englander was not made aware of it until March 6, 2020, when AUSA Jenkins advised Mr. Englander through counsel of the pending charges.  Mr. Englander surrendered the next court day.

---

[2] As set forth below, Mr. Englander's false statements were intended to shield him from personal shame, public scorn, and embarrassment for his inappropriate actions, but were not intertwined with the bribery allegations in the *Huizar* charging documents, or indeed with any bribery allegations.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1       Mr. Englander appeared in court on March 9, 2020 to be arraigned.  He was
2   released on a signature bond that day.  The case received substantial media
3   attention.[3]

4       Mr. Englander's first appearance before this Court was on March 12, 2020,
5   for a trial setting conference.

6       On March 25, 2020, just weeks after Mr. Englander first appeared, he signed
7   a plea agreement, agreeing to plead guilty to Count 1, alleging a violation of 18
8   U.S.C. § 1001.  Dkt. No. 24.  The government agreed to dismiss all § 1512 counts
9   (and all other counts).

10      The plea agreement contained a detailed statements of facts, negotiated by the
11  parties.  Specifically, the factual statement did not reference "obstruction" or
12  "witness tampering" and did not assert that Mr. Englander's actions were intended
13  to cover up a federal offense.

14      The actual entry of the plea was delayed at defense counsel's request, so
15  defense counsel could better understand the Department of Justice's novel position
16  on the elements of § 1001 as presented by Attorney General Barr in connection with
17  *United States  v. Flynn*, Case No. 1:17-CR-232 (D.D.C.), a false statement case, and
18  to determine if the Department of Justice's odd and novel reading of § 1001
19  impacted the instant case.  *See* Dkt. Nos. 28 & 29.[4]

---

21      [3] *See, e.g.*, Joel Rubin & Emily Alpert Reyes, *Ex-L.A. Councilman Englander charged with obstruction in probe alleging lavish spending and escorts*, L.A. Times, Mar. 9, 2020, *available at* https://lat.ms/2XqIKYL; Olga Grigoryants & Ryan Carter, *Ex-LA City Councilman Mitchell Englander arrested by FBI agents*, L.A. Daily News, Mar. 9, 2020, *available at* https://bit.ly/35pd2zC; Andrew Blankstein & Eric Leonard, *Former LA Councilman Pleads Not Guilty to Charges He Lied to FBI During Probe*, NBC News, Mar. 9, 2020, *available at* https://bit.ly/3qdVFKh.

26      [4] *See, e.g.,* Catherine Herridge, *Attorney General William Barr on Michael Flynn, Obamacare and Coronavirus restrictions – Transcript*, CBS News, May 7, 2020, *available at* https://cbsn.ws/35sMHAM; Charlie Savage, *'Never Seen Anything Like This': Experts Question Dropping of Flynn Prosecution*, N.Y. Times,

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

On July 7, 2020, Mr. Englander pled guilty[5] to violating 18 U.S.C. § 1001. The plea received media coverage.[6]

Sentencing is set for January 25, 2021.

### III.   THE PLEA AND PLEA AGREEMENT

The instant plea agreement—in the context of "contemporary" plea agreements—is straightforward.  Mr. Englander agreed to plead guilty to Count 1, making false statements in violation of 18 U.S.C. § 1001.  The government agreed it would dismiss all other counts at sentencing.  Mr. Englander agreed not to contest the factual basis in the plea agreement.  The plea agreement did not adopt the facts contained in the indictment, but instead contained a carefully negotiated, mutually agreed upon statement of facts.  Both parties are permitted to amplify on the factual basis.  Specifically:

- There is no agreement as to the applicable guideline level;
- Except for the U.S.S.G. § 3E1.1 adjustment for acceptance of responsibility, there is no agreement to any guideline adjustment or departure or variance;
- The government is free to argue for any sentence up to 36 months;
- Mr. Englander is free to argue for any sentence, including probation;
- There is an appellate waiver which provides only a limited right to appeal.

---

May 7, 2020, *available at* https://nyti.ms/3sc1n0K.

[5] Mr. Englander was accompanied to Court by his wife and adult daughters. They have been subject to media and social media attention.

[6] *See, e.g.*, David Zahniser, Dakota Smith & Joel Rubin, *Former L.A. Councilman Mitchell Englander to plead guilty in corruption case*, L.A. Times, Mar. 27, 2020, *available at* https://lat.ms/38xPJFP; City News Service, *Former LA Councilman Mitchell Englander Agrees to Plead Guilty*, NBC News, Mar. 27, 2020, *available at* https://bit.ly/2Lch5sp; *Mitch Englander To Plead Guilty To Obstructing Federal Public Corruption Investigation*, CBS Los Angeles, Mar. 27, 2020, *available at* https://cbsloc.al/35sxob7.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

The offense to which Mr. Englander pled carries a maximum sentence of five (5) years; there is no prohibition on a probationary sentence.

## IV.   OBJECTIONS, CORRECTIONS, AND ADDITIONS TO THE PRESENTENCE INVESTIGATION REPORT

Mr. Englander agrees with the Presentence Investigation Report's analysis and conclusions.  He has two minor corrections: (1) Paragraph 68 of the PSR indicates that Mr. Englander's childhood and long-time friend, Mark Hunter, resides in New York; Dr. Hunter actually resides in Missouri; and (2) Paragraph 98 indicates that Mr. Englander's home sale occurred "several" years ago; it was actually in 2019.

## V.   GUIDELINE ANALYSIS

### A.   The Presentence Investigation Report

The PSR determines that U.S.S.G. § 2B1.1 applies to the violation of 18 U.S.C. § 1001 here; § 2B1.1 has a base offense level of six (6).  PSR ¶ 41. Specifically, the PSR finds that no enhancements are appropriate because the offense did not involve financial loss; thus, the PSR does not apply the enhancement under § 2B1.1(b)(1).  *Id.* ¶ 42.  And because § 1001 "sufficiently captures" Mr. Englander's conduct, the PSR concludes that no other guideline is applicable.  *Id.* ¶¶ 43-44.  The PSR does not apply any other enhancements or adjustments, concluding that Mr. Englander did not use a position of public trust to facilitate or conceal his offense under § 3B1.3 and did not obstruct the "investigation, prosecution, or sentencing of the instant offense of conviction" under § 3C1.1.  *Id.* ¶¶ 45-50.  The PSR applies a two-level downward adjustment for "clearly demonstrat[ing] acceptance of responsibility for the offense" under § 3E1.1(a).  This results in an offense level of four (4).  *Id.* ¶¶ 51-52.

### B.   Mr. Englander's Guideline Position

Mr. Englander agrees with the analysis in the PSR.  Mr. Englander pled to violating 18 U.S.C. § 1001, making a false statement.  Mr. Englander's underlying

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

conduct is not alleged to have violated any federal laws,[7] and he is not alleged to have made false statements to conceal that others violated federal laws; his false statements were designed to hide his own actions, which while embarrassing, also did not violate federal laws.

The sentencing guidelines apply § 2B1.1 to most "1001" violations. *See* Commentary, Statutory Provisions, § 2B1.1. Indeed, United States Attorney's Offices in this District and elsewhere have continually applied § 2B1.1 to false statement offenses. *See, e.g., Flynn, supra,* Dkt. No. 3; *see also United States v. Dredd,* Case No. 2:15-CR-569-DSF (C.D. Cal.), Dkt. No. 311.[8] *See also* Defendant Mitchell Englander's Response to Government's Objections to Presentence Investigation Report (hereinafter "Response").

The sentencing guidelines have one exception to applying § 2B1.1 to false statement cases; as set forth in the Commentary to U.S.S.G § 2J1.2, instead of § 2B1.1, § 2J1.2 (obstruction of justice), applies to "1001" cases "when the statutory

---

[7] Mr. Englander's plea agreement does not suggest that Mr. Englander was involved in any bribery. The Factual Basis to the plea agreement acknowledges that Mr. Englander accepted $15,000 from Businessperson A, but this is not a federal crime. In *McDonnell v. United States*, 136 S. Ct. 2355, 2371-72 (2016), the Supreme Court held that federal bribery requires a quid pro quo with an "official act" that "involve[s] a formal exercise of governmental power." The act must be "something specific and focused that is 'pending' or 'may by law be brought' before a public official [and] the public official must make a decision or take an action . . . or agree to do so" with regard to that exercise of power. Notably, "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)— without more—does not fit that definition of 'official act.'" *Id.*

[8] In *United States v. Dredd*, a recent "1001" case in this District prosecuted by AUSA Dragalin and involving the USAO's public corruption unit, the government's sentencing position (filed by AUSA Dragalin) argued that § 2B1.1 applied to a defendant who was a deputy sheriff convicted of a false statement offense, who lied to the FBI, and prepared false documents to conceal a civil rights offense against a person being held in Los Angeles County custody. *See also United States v. Dredd*, Case No. 19-50220, 2020 WL 6281513 (9th Cir. Oct. 27, 2020).

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

6                                                 Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

1   maximum term of eight years' imprisonment applies because the matter relates to

2   international terrorism or domestic terrorism, or to sex offenses . . ."  This exception

3   does not apply in the instant case as this is not a terrorism or sex case with an eight-

4   year statutory maximum.  *See also* U.S.S.G Appendix A, 18 U.S.C. §1001 ("2B1.1,

5   2J1.2 (when the statutory maximum term of eight years' imprisonment applies . .

6   .")).  In fact, the false statement offense to which Mr. Englander pled guilty has a

7   five-year statutory maximum and does not allege a sex offense or terrorism; thus the

8   appropriate base offense level is provided by § 2B1.1.[9]

9        Under § 2B1.1, the base offense level is six (6).  PSR ¶ 41; U.S.S.G. §

10  2B1.1(a)(2).  No other adjustments or enhancements are applicable.  PSR ¶¶ 45-50.

11  After the reduction for acceptance of responsibility, the adjusted offense level, as

12  calculated in the PSR, is four (4).  *Id.* ¶¶ 51, 52.

13

14

---

15        [9] Contrary to the government's argument and its Objections, Mr. Englander
    has not stipulated to a more serious offense than the offense of conviction.  *See* PSR
16  ¶ 41 n.1 (concluding that "although USSG §1B1.2(a) allows for the application of
17  another guideline when the plea agreement contains a stipulation that specifically
    establishes a more serious offense than the offense of conviction, the Probation
18  Officer does not agree that the plea agreement contains the requisite stipulation.").
    Specifically, Mr. Englander did not agree to a violation of 18 U.S.C. § 1512 or to
19  facts that constitute such an offense.  In fact, the factual statement to the plea
20  agreement does not use either the term "witness tampering" or the word
    "obstruction."  And the government, despite having charged such an offense in the
21  indictment, did not insist on including that charge in its plea agreement.  Had the
22  government been able to prove a § 1512 violation, policy directed them to pursue
    the § 1512 charge.  *See* Memorandum For All Federal Prosecutors, Department
23  Charging and Sentencing Policy, Office of the Attorney General, May 10, 2017,
24  *available at* https://www.justice.gov/opa/press-release/file/965896/download
    (directing prosecutors to "charge ***and pursue*** the most serious, readily provable
25  offense," *i.e.*, "those that carry the most substantial guidelines sentence") (emphasis
26  added).  This is fully addressed in Mr. Englander's Response to the Governments'
    Objections to the Presentence Investigation Report filed contemporaneously with
27  this position paper and incorporated by reference herein.
28

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

7                                               Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

|   | Base Offense Level | 6 |
|---|---|---|
|   | Acceptance of Responsibility | - 2 |
|   | Adjusted Offense Level | 4 |

Mr. Englander has no prior criminal convictions and is criminal history Category I; the Guideline range is 0-6 months. *Id.* ¶¶ 57, 103.

## C.   The Government's Guideline Analysis is Flawed

On January 4, 2021, the government filed its Objections to Presentence Investigation Report for Defendant Mitchell Englander, setting forth its disagreement with the PSR's guidelines analysis and instead suggesting the matter should be governed by U.S.S.G. § 2J1.2 and, with enhancements, should result in an adjusted guideline level of 15. In a concurrently filed Response to that document, Mr. Englander establishes that the government's analysis is flawed, and without legal or factual support. Mr. Englander's Response, by focusing on the guidelines themselves, and the plea agreement and facts stipulated therein, debunks the government's claim that § 2J1.2 applies here. The Response also shows that the enhancements urged by the government lack factual and legal support. The Response is incorporated by reference herein.

## VI.   A SENTENCE OF PROBATION IS THE JUST AND APPROPRIATE SENTENCE

### A.   Legal Standard

In determining Mr. Englander's sentence, the Court considers a broad range of statutory sentencing factors, along with the advisory guidelines. *United States v. Booker,* 543 U.S. 220, 245-46 (2005); 18 U.S.C. § 3553(a) ("the 3553" factors). The Court must impose a sentence "sufficient, but not greater than necessary" to achieve the objectives of sentencing. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc) (*citing* 18 U.S.C. § 3553(a) and (a)(2)). The "3553" factors include "the history and characteristics of the defendant" (18 U.S.C. § 3553(a)(1)); "the nature and circumstances of the offense" (*id.*); the "need to avoid

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

unwarranted sentence disparities" (*id*. § 3553(a)(6)); the need to "reflect the seriousness of the offense," "provide just punishment," "protect the public," and provide "adequate deterrence" (*id*. § 3553(a)(2)(A)-(C)); and the need to "promote respect for the law."  *Id*. § 3553(a)(2)(A).  An analysis of these factors here establishes without question that a probation sentence is "sufficient, but not greater than necessary" in that it provides just punishment, protects the public, provides adequate deterrence, and promotes respect for the law.[10]

**B.**     **Nature and Circumstances of the Instant False Statement Offense**

**1.**     **Overview**

Mr. Englander appeared in Court in July 2020, pleading guilty to making false statements in violation of 18 U.S.C. § 1001 and accepting responsibility for his conduct.  The plea agreement contained a detailed factual basis; that factual basis was read in Court by AUSA Jenkins at the entry of the plea.  In his letter to this Court, Mr. Englander candidly admits: "I made false statements to the FBI . . . I alone am responsible for my actions and there is nothing I regret more in my life." Englander Letter, Ex. A.

The PSR accurately describes the false statement offense.  Details provided by the USAO in discovery further set forth the circumstances of the offense.

Mr. Englander's offense involves false statements made by Mr. Englander about his interactions with Businessperson A that occurred over an approximately twelve-day period in June 2017.  PSR ¶¶ 6-36.  These interactions occurred on a trip to Las Vegas and at a charity golf tournament at the Morongo Casino and Resort in Palm Springs.  This twelve-day period provided the underlying subject matter of Mr. Englander's untruthful statements, but nothing that Mr. Englander did in those

---

[10] Should the Court determine the applicable guideline range is higher than that found in the PSR and set forth here, Mr. Englander submits that the "3553" factors would still establish that probation is the appropriate sentence and moves the Court for a variance to a level to allow for a probationary sentence.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

9                                    Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

twelve days is itself alleged to be a federal crime; rather, it is simply the subject matter of the false statements.

Businessperson A had no business dealings ever with Mr. Englander.  He did not solicit Mr. Englander to perform any official acts or provide any official benefits to him or his businesses (or to provide any official benefits to any third parties).  He did not, to Mr. Englander's knowledge, even have any business with the City of Los Angeles.

In August 2017, Businessperson A began "cooperating" with the USAO.[11] At the time Businessperson A began cooperating Mr. Englander had not yet been interviewed by AUSA Jenkins or the FBI.

In the late summer or early fall of 2017, Mr. Englander was contacted by the FBI, and invited to meet with agents and AUSA Mack Jenkins for a voluntary interview.  Mr. Englander obtained counsel who contacted AUSA Jenkins.  Mr. Englander was described by AUSA Jenkins as a "witness" or "subject" of the investigation, not a "target."  He was further described as "tangential" to the investigation.  *See* Levine Decl. ¶ 5.

The interview was set for October 19, 2017.  A standard proffer ("Queen for a Day") agreement was provided at the first interview session.  According to the discovery provided by the government, shortly before the proffer session, Businessperson A (then a cooperator) reached out to Mr. Englander to set a meeting with him.  *See* Levine Decl. ¶ 10 █████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████

---

[11] The government indicated that Mr. Englander introduced Businessperson A in June 2017 to another businessperson at Businessperson A's request.  The introduction of one person to another is not a federal crime.  *See McDonnell v. United States,* 136 S. Ct. 2355, 2371-72 (2016).

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Case No. CR 20-35-JFW

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

1   The meeting between Businessperson A and Mr. Englander, which occurred

2   on October 4, a couple of weeks before Mr. Englander's proffer, was taped by the

3   FBI.  At that meeting, Businessperson A told Mr. Englander that he had interviewed

4   with the FBI and told Mr. Englander that he wanted to discuss his interview with

5   Mr. Englander before Mr. Englander was interviewed.  Businessperson A detailed

6   his purported FBI interview for Mr. Englander, not coincidentally focusing on some

7   of the topics that were raised later that month by AUSA Jenkins directly in the

8   FBI/USAO interview of Mr. Englander.  Given that Businessperson A was

9   cooperating, and that the government taped these two meetings, there is every

10  reason to believe the government directed Businessperson A to raise these topics.

11  Mr. Englander's interview session with the FBI and USAO lasted about two

12  hours.  In the interview session, Mr. Englander made false statements.

13  In early 2018, AUSA Jenkins requested that Mr. Englander return to continue

14  the interview under the same proffer.  According to AUSA Jenkins, the second

15  session was to better understand areas covered in the first session, about which the

16  agents were confused.  *Id.* ¶ 6.  Discovery indicates that before the second session

17  occurred, Businessperson A again reached out to Mr. Englander, and again met with

18  him, secretly taping the conversation.  *See id.* ¶ 11 ███████████████

19  ████████████████████████████████████████████

20  ████████████████████████████████████████████

21  ███████████████   Businessperson A directed the conversation to the FBI's

22  "investigation," and directed it to topics that were covered by AUSA Jenkins in the

23  second session to occur the next day.

24  On February 7, 2018, the FBI and USAO continued their interview of Mr.

25  Englander.  During that interview, just as during the initial interview session, Mr.

26  Englander made false statements related to his own conduct at the two June 2017

27  events, and his meeting with Businessperson A, a meeting monitored by the

28  government.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

According to discovery, this pattern—an outreach by Businessperson A to Mr. Englander and a surreptitiously taped meeting between the two in advance of an interview session—held for the last session of Mr. Englander's proffer.  *See id*. ¶ 12

███████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████  Before each session, Businessperson A reached out to Mr. Englander and/or arranged to meet Mr. Englander.  At each monitored meeting, Businessperson A volunteered information about questions he purportedly had been asked by the government or discussions he had had with his lawyer, and discussed what Mr. Englander should say if he was asked about the same topics.  *Id*. ¶ 13.

In each meeting of his proffer, Mr. Englander truthfully answered questions about the government's core corruption investigation; he made false statements about his personal conduct (that has not been alleged to be a federal criminal violation) that occurred in June 2017, and his meetings with Businessperson A, which discovery indicates were monitored by the government.

## 2. Mr. Englander's False Statement Offense is Not Part of the Alleged Offenses/Indictment of Mr. Huziar and His Co-Defendants

Mr. Englander made his false statements during a set of interviews[12] conducted by the same prosecution team that is responsible for the government bribery and corruption investigation of Mr. Huizar and Mr. Huizar's acceptance of money in exchange for official acts.  Significantly, Mr. Englander's false statements

---

[12] The same proffer agreement covered all three sessions.  *See* Levine Decl. ¶ 2.  AUSA Mack Jenkins was the responsible AUSA in all three sessions.  *Id*. ¶ 3.  AUSA Dragalin was present at the last two sessions.  *Id*.  FBI Case Agent Andrew Civetti was present at all three sessions.  *Id*.  Before the sessions, AUSA Jenkins never indicated that Mr. Englander had become a target of the investigation.  *Id*. ¶ 5.

Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

are unrelated to the Huizar allegations.  As the *Los Angeles Times* observed:  "In some ways, Englander seemed like a politician who had wandered into the middle of someone else's corruption probe."[13]

### 3. Mr. Englander's Relationships With Businessperson A Did Not Involve Any City Business

Mr. Englander met Businessperson A in or about late 2016 or early 2017.  Mr. Englander was impressed by what he believed Businessperson A's business was: an environmentally-concerned recycling business.  To Mr. Englander's knowledge, Businessperson A did not work with the City and had no contracts or sub-contracts with the City.  Businessperson A never asked for any official act from Mr. Englander.  He did not describe himself as a cabinetmaker (or his business as cabinet-making), nor did he ever indicate that he had any interest in any City-related businesses or contracts.[14]

### 4. Mr. Englander Has Fully Accepted Responsibility for His Conduct

On March 25, 2020, less than a month after first being informed of the charges, and within weeks of arraignment, Mr. Englander signed a plea agreement. He entered his guilty plea on July 7, 2020, accepting full responsibility.  He has not minimized his conduct or attempted to blame others.  *See* PSR ¶¶ 39, 75.

---

[13] David Zahniser & Emily Alpert Reyes, *Former L.A. Councilman Mitchell Englander pleads guilty in City Hall corruption case*, L.A. Times, July 7, 2020, *available at* https://lat.ms/38BmPot.

[14] In its Objections to the PSR, the government postulates about things that "could have" occurred in these meetings between Mr. Englander and Businessperson A.  It also speculates as to how Businessperson A felt.  Of course, the government had tapes and Businessperson A was working as a cooperator.  Had any corrupt activity beyond false statements occurred, one can be sure that conduct would have been charged and pursued.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

In his letter to the Court, Mr. Englander takes full responsibility for his conduct explaining, "I alone am responsible for my actions." Englander Letter, Ex. A. He acknowledges: "My destructive actions have caused immense pain for my wife and daughters, the very people I love the most. My situation has been and will continue to be publicly humiliating to them. I will feel the pain I have caused my family long after others have forgotten about my actions." *Id*.

Mr. Englander's family, friends, co-workers, and others with whom he had interactions in his years of service, write that Mr. Englander appears truly remorseful. Without minimizing his actions, he has asked for forgiveness from those he has impacted. John and Julie Carson, Mr. Englander's uncle and aunt by marriage, write: "Mitch is aware of the gravity of his actions with respect to the events that are at issue and deeply regrets his lapses in judgment that brought him to this place. Mitch acknowledges his wrongdoing. He has spent the past months thinking about and healing from the shock of his situation. In our conversations with Mitch he appears humbled and apologetic . . ." Support Letters, Ex. B-6.

Lawrence Bavaro, an LAPD Sergeant with whom Mr. Englander worked during his service as a Reserve Police Officer, echoes this opinion: "I had a long and emotional conversation with Mitch over his court case. The first thing he told me was he made a mistake and he is taking full responsibility for it. He apologized to me for his actions and asked me for forgiveness, which I gave him. Mitch made a mistake, which he regrets, and is taking ownership of it." Support Letters, Ex. D-3.

Bernard Khalili, a fellow Reserve Officer and Los Angeles business owner, confirms the same sentiment: "He has shown extensive and genuine remorse for his mistake, demonstrating that he understands the gravity of his actions . . . He has lost his job, he has lost his reserve officer status—one of his most important accomplishments— and he experiences shame on behalf of himself and his family's reputation and will have to live with this heavy burden for the foreseeable future." Support Letters, Ex. D-5. *See also* PSR ¶ 39.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

14

Case No. CR 20-35-JFW

C.   **Mr. Englander's History and Personal Characteristics Support Probation:  He Is A Giving, Caring, and Exemplary Family Man and Citizen, Working Hard to Have a Positive Impact On The Community[15]**

1.   **Mr. Englander's Early Years Were Difficult; Through Community, He Was Able To Overcome Great Challenges**

Mitchell Englander was born on July 25, 1970, the youngest child of Linda Englander and Stanley Bloom.[16] ████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████  When Mr. Englander was five years old, his father abandoned the family, both physically and financially.[17]

Mr. Englander's mother was left to raise him, his older brother Andrew, and his sister Natalie, on her own; this proved difficult.  With no financial support from Stanley, a disabled veteran who rarely worked, she had little money. ████████ ████████████████████████████████████████████████████  She found it difficult to maintain employment and the family frequently subsisted on government food giveaways (free cheese) and a weekly food box donated by a local synagogue.  Clothes were often donated.  And, after their family home was foreclosed on when Mr. Englander was almost eight, they lived in a string of temporary residences, and were at times homeless, moving regularly.  When Mr. Englander reached his teens, he spent substantial time at his best friend's home,

---

[15] Mr. Englander's personal history is detailed in the PSR ¶¶ 62-75; it is supplemented herein.

[16] Mitchell's birthname was Stuart Mitchell Bloom.  He legally changed his name to Mitchell Englander at the age of 18 to honor his mother.  PSR ¶ 70.

[17] After his father abandoned the family, Mr. Englander would travel to Arizona to see him periodically.  PSR ¶ 67. ████████████████████████████ ████████████████████████████████████████████████████████

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

15                                    Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

1  sometimes staying for weeks at a time.  *See* Support Letter from M. Schwartz, Ex.

2  C-1; discussed, *infra*, at p. 17.

3  ████████████████████████████████████████████

4  ████████████████████████████████████████

5  ██████████████████████████████████████████████

6  ████████████████████████████████████████

7  ██████████████████████████████████████████████

8  ██████████████████████████████████████████████

9  ███████████████████████████████████████████████

10  ████████████████████████████████████████████

11  ████████████████

12      As challenging as his home life was, Mr. Englander's extraordinary early

13  challenges extended beyond his dysfunctional home.  When Mr. Englander was

14  about six years old he developed a rare eye disease, vernal conjunctivitis, which

15  caused bumps to develop on the inside of his eyelids that scratched his corneas

16  while he slept.  Because it was difficult to diagnose, Mr. Englander suffered with the

17  condition for several formative years.  On bad days, the condition was incredibly

18  painful, and some mornings he could not open his eyes or walk to school without his

19  brother's assistance.

20      Because of the vision problems created by his eye condition, Mr. Englander

21  struggled academically and was placed in Special Education in the third grade and

22  transferred to a different school.  Even though his eye condition had mostly resolved

23  by the time Mr. Englander completed fifth grade, the school failed to recognize that

24  the physical ailment was the sole cause of his early academic problems.  Mr.

25  Englander did not return to his original school or to mainstream classes and was

26  kept in special education classes through the sixth grade.  PSR ¶ 86.

27      Community volunteers and dedicated public servants provided a lifeline for

28  Mr. Englander, and became role models, which Mr. Englander needed to prepare for

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

16                                    Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

the well-adjusted and pro-social life he was to lead.  When Mr. Englander was seven years old, his mother signed him up with the Jewish Big Brothers program.  Two years later, the organization assigned Mr. Englander a Big Brother, Ed Krug.  Mr. Krug had a significant positive impact on Mr. Englander's development and the two spent hours together every other weekend for about two years.  As Mr. Krug writes to the Court: "We went to amusement parks, museums, ball games, and the Mall . . . During that time Mitch and I developed a very close relationship.  He was a sweet, kindhearted kid."  Support Letters, Ex. C-3.  The two lost touch after Mr. Krug moved to the East Coast in 1986, but they reconnected in 2009 and Mr. Krug was impressed to learn about Mr. Englander's public service and charity work, explaining to the Court: "I know he [Mr. Englander] took great pride in giving back and accomplished many important and worthwhile endeavors."  *Id*.  Mr. Englander credits Mr. Krug for being a role model of a father and a husband.

Mr. Englander also benefited from the generosity of friends, finding safety, security, and refuge in the home of his childhood best friend, Mark Hunter (originally Schwartz) and Dr. Hunter's family.  Mr. Englander and Dr. Hunter were originally introduced by their sisters and were inseparable for much of their adolescence.  Mr. Englander regularly ate meals with Dr. Hunter's family and slept over for days and sometimes weeks at a time.  Dr. Hunter's mother, a retired elementary school teacher, writes to the Court: "During particular[ly] rocky times, Mitch would stay for days and even weeks.  When things at home became unbearable, he moved in.  He was witty, intelligent, kind, humble and appreciative and as such his presence was an asset to our home and our family."  Support Letters, Ex. C-1.  From the Schwartzes, Mr. Englander learned about a positive and loving family life and about the joy of caring for others in need by sharing what you have.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

17                                          Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

### 2. Mr. Englander Possesses an Industrious Spirit and Began Working at a Young Age

Due to his family's acute financial struggles, Mr. Englander began selling bulk candy door-to-door when he was nine years old, using the money to buy groceries. When he was 11, he would borrow a neighbor's lawnmower and knock on doors offering to mow lawns. When he turned 14, he began working for a janitorial service owned by his late uncle, Michael Englander, eventually working his way up to a full-time position. As a teenager, Mr. Englander cleaned floors and toilets and functioned as an informal operations manager, working 7 p.m. to 3 a.m. five to six days a week. Because Mr. Englander was working full-time, he arranged to complete high school at Miguel Leonis Continuation High School in Woodland Hills, where he could take classes in the mornings and work at night. The principal, Odus Caldwell, recognized Mr. Englander's drive and intelligence and served as a mentor and role model to him, much like Mr. Krug had done previously.[18]

After graduating high school, Mr. Englander moved to Arizona with Dr. Hunter to start a janitorial and carpet cleaning business. His brother Andrew had already moved there and was a proponent of the lower cost of living. Within weeks of moving to Arizona, Mr. Englander was injured in a serious car accident and was referred to a chiropractor. Turning his misfortune into a lifelong good fortune, he met the chiropractor's receptionist, Jayne Schulte, began dating, and soon became serious. Mitchell and Jayne married in 1993. *See* Support Letter from J. Englander, Ex. B-1.

---

[18] After graduating from Miguel Leonis in June of 1988, Mr. Englander founded the Miguel Leonis Achievement Scholarship, which he spearheaded for several years.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

### 3. Mr. and Mrs. Englander Devoted Their Young Adult Years to Building Family, Building Community, and Performing Good Works In The Community

After a couple of years in Arizona, Mr. Englander returned to Los Angeles to care for his mother, Linda, ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████

Mr. Englander suffered another traumatic family medical issue a few years later. ████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

Also in 1994, Mr. Englander's maternal uncle, Michael Englander, for whom Mr. Englander had worked in his high school years at Michael's janitorial company, was murdered by four young gang members in a parking lot as he was leaving a book store, apparently as part of a gang initiation rite. His uncle's murder had a deep and lasting impact on Mr. Englander; it motivated Mr. Englander to apply for and eventually become an LAPD Reserve Police Officer and to serve the community for over ten years in that role. *See* Section IV(C)(3)(c), *infra*.[19]

_____

[19] This felony conviction required Mr. Englander to resign from the force (he resigned immediately after being charged). This loss of his right to serve as a reservist is a real loss to Mr. Englander. He reveled in his role as a reservist, especially when called to visit public schools.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1             **(a)**     **Mr. Englander as a Family Man**

2       Mitchell and Jayne have been married for 27 years; they have two daughters.

3 The Englanders renew their marriage vows every five years, in the presence of their

4 daughters, reaffirming their commitment to each other and their family.

5       That family unit has not been without difficult times.  The loss of loved

6 family members in senseless deaths is detailed above.  ████████████

7 ████████████████████████████████████████

8 ████████████████████████████████

9 ████████████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████

12 ████████████████████████████████████

13 ████████████████████████████

14       Mr. Englander's commitment to his family is deep and unwavering.  Mr.

15 Englander's wife, Jayne, writes: "As a family man, [Mitch] loved to include his

16 daughters in volunteering.  Nearly every weekend, there was an activity from

17 serving meals to seniors to devoting our family time during the holidays to passing

18 out toys to less fortunate children or merely cleaning up graffiti in the neighborhood.

19 And yet, he never missed a single dance recital, volleyball game, or school play for

20 the girls . . . There was a reason Mitch's personal proudest achievement was when

21 The National Father's Day Council nominated him and awarded Father of The Year

22 in 2006."  Support Letter, Ex. B-1.

23       Support letters describe the Englander family.  John and Julie Carson (Mrs.

24 Englander's uncle and aunt), write: "As a family man, Mitch is dedicated, loving,

25 and self-sacrificing.  He is very proud of his wife Jayne.  He likes to express his

26 admiration for Jayne by saying 'I married up'. . . . Their family unit is one to be

27 admired.  They love and support each other, and love being with each other."

28 Support Letters, Ex. B-6.  Former staff member Douglas Tripp observed Mr.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

Englander's dedication to family firsthand: "His family was always his priority. So much so that if Jayne or his daughters called, he would stop whatever he was doing, and answer their call. It didn't matter who the meeting was with or what it was about, they always came first." Support Letters, Ex. E-3. Arnie Berghoff, the President of a Los Angeles-based public affairs firm and Mr. Englander's co-founder of the Los Angeles Political Roast, which raises money for the American Diabetes Association, writes: "Mitch is also a loving husband and father. His wife, Jayne and his two lovely daughters are his pride . . . In my opinion, the fact that his unlawful actions have so hurt his family is the most painful aspect of this matter." Support Letters, Ex. F-4.[20]

---

[20] Mr. Englander's focus on family life extended to his treatment of his staff when he was a Councilman. ███████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████ Another staff member, Douglas Tripp, explains that ██████████████████ Mr. Englander made sure Mr. Tripp and his wife spent much time in the ██████████████, encouraging Mr. Tripp to prioritize family. Support Letters, Ex. E-3. Others whom Mr. Englander met through his children also note Mr. Englander's dedication to community and family. ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████ Joseph Bongiovi, a local businessperson, recalls: "Mitch and Jane have always had such an amazing relationship. Especially given Mitch's tireless efforts to be more and more involved in helping his community." Support Letters, Ex. G-2. He adds: "I used to always say how I couldn't figure out when Mitch slept. He was driven by the need to help people more th[a]n I have ever seen anyone." *Id.*

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1
2

**(b)** <u>**Mr. Englander's Community Involvement and Public**</u>
<u>**Service Are Deep, Substantial, and Significant**</u>

3  After caring for his mother and upon her death, in 1990, Mr. Englander's

4  maternal uncle, Harvey Englander, offered Mr. Englander a position at his public

5  relations firm, Campaign Management, Inc., and Mr. Englander accepted it.  This

6  deepened Mr. Englander's interest in politics and public service, and launched Mr.

7  Englander's career in public service.

8  At Campaign Management, Inc., Mr. Englander focused on public and

9  government affairs, learning the field hands-on.[21]  While there, he learned the "art"

10  of charitable fund-raising and Mr. Englander, along with his uncle Harvey

11  Englander, co-founded the Los Angeles Political Roast, described above, ███████

12  ████████████████████████████████  Mr. Englander's Roast co-

13  founder, Mr. Berghoff, explains: "[Mr. Englander] cares and is willing to help others

14  often at great sacrifice to himself.  There is no doubt that the Roast has become so

15  successful because of Mitch's hard work and dedication."  Support Letters, Ex. F-4.

16  Mr. Englander's commitment to charity (and the unglamorous fundraising)

17  continued; he has devoted time and energy to numerous charitable organizations.

18  Mr. Englander has been a supporter of The Nicole Parker Foundation for Children,

19  an organization that seeks to address and eradicate child abuse.  The Foundation is

20  run by Mr. Englander's long-time friend and fellow police reservist, Travis Parker,

21  whose sister was murdered at eight years old, and in whose honor the organization

22  was founded.  Mr. Parker explains: "Over the years, Mitch has devoted countless

23  hours to the Foundation and has personally and professionally played an integral

24  part in the success of the Foundation—particularly the children's rooms the

25

26
27
28

---

[21] While Mr. Englander attended some college, he never completed a degree, instead focusing on work and family obligations, as well as community/public service.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Case No. CR 20-35-JFW

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

1   Foundation have built or remodeled in approximately a dozen police stations across

2   Los Angeles County.  Children's rooms provide a space in police station(s) where

3   children can feel safe after witnessing or surviving traumatic events."  Support

4   Letters, Ex. F-1.

5       Mr. Englander worked with the North Valley Family YMCA at Porter Ranch,

6   serving on and chairing multiple committees.  In 2008, Mr. Englander was elected

7   by the Board to be the Board of Managers Chair, serving in that role until 2010 and

8   leading the YMCA Capital Campaign to expand the facility by adding additional

9   buildings and a warm water pool for seniors.  In 2010, Mr. Englander received the

10  YMCA Lifetime Achievement Award, having helped to raise over $1.1 million for

11  "The Kids At The Y" program.  Support Letter from J. Stanton, Ex. F-3.

12      Through the San Fernando Valley Chapter of the Junior Chamber of

13  Commerce (Jaycees) and the Los Angeles Police Department Devonshire Policy

14  Activity League (PALS), Mr. Englander raised funds—and awareness—to help

15  youth in need.  On the Jaycees Board, Mr. Englander organized the annual Jaycees

16  Gala, which honored members of the organization.  Victoria Bourdas Martinez, who

17  worked with Mr. Englander on the Board, writes: "We planned the events from start

18  to finish—date, theme, invitations, program, and award recipients.  Mitchell was

19  passionate about our gala each year.  He was instrumental in researching alumni

20  members and their community involvement."  Support Letters, Ex. F-5.  On the

21  PALS Board, Mr. Englander raised funds to build the current youth center, create an

22  outdoor playground and soccer field, and organize the program that serves youth 7-

23  17 years old.  Ms. Martinez, who also served with Mr. Englander on the PALS

24  Board, writes: "Mitchell worked tirelessly to get us in front of community members

25  and organizations so that we could tell our story and get others to assist us.  Being in

26  City Council, he was able to educate other elected officials on the importance of

27  local youth programming."  *Id.*

28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

23                          Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

1      Through these organizations, and the causes they champion, Mr. Englander

2 has been able to help children who need community and support, and sometimes just

3 a safe place to go, like he once did.

4            **(c)**      **Mr. Englander's Service as a Reserve LAPD Officer**

5      Overwhelmed by the senseless killing of his uncle, Mr. Englander decided to

6 serve in law enforcement.  He began applying to be an LAPD Reserve Officer in

7 1998, an unpaid but demanding position.  Because of the rigorous physical

8 requirements, and a recent spinal surgery, Mr. Englander was rejected for service

9 several times.  He trained and rehabilitated his spine and was finally accepted into

10 the Police Academy in 2005.

11      Reservists go through training and background checks like all full-time

12 recruits.  He graduated at the top of his class and served over 10 years as an LAPD

13 Reserve Officer.  Reserve Officers are required to complete at least 13 two-day

14 deployments yearly (he did much more); Mr. Englander was eventually assigned to

15 the Gangs & Narcotics Division—Fugitive Warrants.  His unpaid service was

16 significant (and ended only when he resigned after he was charged in this case).

17      Mark Blizzard, a 30-year veteran of the LAPD, writes: "When Mitch

18 Englander was appointed to the City Council (CD12), [h]e never stopped doing his

19 Reserve Duties along with supporting the [ ] Volunteer Units.  He was always there

20 for them and was always willing to support any training for them and the Officers.

21 He was always about public safety for all citizens in the community."  Support

22 Letters, Ex. D-1.

23      Mr. Englander's service is also lauded in letters from his LAPD supervisor

24 and fellow Reserve Officers.  Lawrence Bavaro, an LAPD Sergeant-II, writes: "[Mr.

25 Englander] has personally done a lot for his community and for the Officers and

26 Volunteers here at Devonshire Division.  Mitch has volunteered for numerous

27 worthy charitable organizations, such as Supporters Of Law Enforcement in

28 Devonshire (S.O.L.I.D.) which raises money to support Devonshire, and our Police

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

24

Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

Athletics League Supporters (PALS) where he was an executive board member, and was instrumental in raising funds to build the PALS center for after school care of our community youth." Support Letters, Ex. D-3.

Bernard Khalili, a fellow Reserve Officer, recalls: "[I]n one instance when working with Mitch, we were experiencing radio miscommunications and could not adequately work with the LAFD. When we realized that there was a huge communication issue between departments, he took it upon himself to personally research how to resolve this issue and later as a city councilman, he enacted radio reforms where we could effectively and efficiently entertain inter-agency communication—a critical contribution that in my estimate, has saved hundreds of lives." Support Letters, Ex. D-5.

Paul H. Burleigh, an attorney with whom Mr. Englander worked for the nonprofit California Emergency Mobile Patrol ("CEMP"), which supports LAPD efforts, writes: "As a non-profit, CEMP relies entirely on donations to fund its operating expenses, purchase vehicles and equipment, and keep its medical supplies current so that CEMP can continue to function in a 'mission ready' status. CEMP worked extensively with Mr. Englander in support of his efforts to highlight the benefits of CEMP and to secure funding to assist with some it its operational needs . . . As a result of Mr. Englander's efforts, the city council was educated about the services that CEMP provides to LAPD. The council recognized the value those services had for the community and arranged to provide some financial support for CEMP that allowed it to address some of its equipment and vehicle needs and to become better equipped to handle the challenges of a search [and] rescue team, and make it an even more valuable resource to the LAPD and the community." Support Letters, Ex. D-6.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

25

Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

**4.** **Mr. Englander's Service as the Chief of Staff to a Council Member and as a Council Member Enhanced the City of Los Angeles**

**(a)** **Work as Chief of Staff for the 12th Council District**

In 2001, after Mr. Englander had worked for about a decade in public relations, Greig Smith, also an LAPD Reserve Officer, and then a City Council candidate for the 12th District (the area where Mr. Englander grew up), offered Mr. Englander a position as his Campaign Manager.  Mr. Englander accepted.  When Mr. Smith was elected, Mr. Englander became his Chief of Staff, a position that enabled him to serve his City and follow his passion of volunteerism, while providing the stability and more regular hours to actively participate in raising his family.

While serving as Mr. Smith's Chief of Staff, Mr. Englander focused on community projects that benefited those in need—both inside and outside Mr. Smith's District.  Because of his own traumatic youth and life experiences, these were the type of projects and programs that Mr. Englander could envision making a real difference in the lives of other youths from similar backgrounds.

In 2007, Mr. Englander co-chaired an effort to raise money for the PALS Youth Center—a state-of-the-art facility in Park Parthenia, one of the highest crime areas in the San Fernando Valley.  Mr. Englander and others raised millions of dollars and negotiated a long-term lease of the land for $1 annually.  The PALS board honored Mr. Englander's role in the project by naming the outdoor sports court "Englander Field."  Laine Caspi, a business owner and community activist who served on the PALS executive board, writes to the Court: "Largely due to Mitch's involvement in PALS, we have what is widely considered to be the best center in California.  Two years ago, we had our first PALS kid get accepted to Harvard!  On top of that, we have kids that go to UCLA, Berkeley, CSUN, you

Case No. CR 20-35-JFW

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1   name it.  It's unlikely that any of these kids would have this opportunity if not for

2   the PALS center and Mitch's involvement."  Support Letters, Ex. F-2.[22]

3       Mr. Englander helped spearhead a campaign to rescue the West Valley Boys

4   and Girls Club, which was in danger of closing after it lost its lease in 2004.  (The

5   Club was close to where Mr. Englander grew up.)  Mr. Englander worked with

6   others to find a new location for the Club and applied to an *Extreme Makeover*

7   program to get help to renovate the Club.  The Club's application was accepted, and

8   the Boys and Girls Club was refurbished.  Today, the Club provides classes and

9   activities to 800 at-risk youths.

10      Mr. Englander also actively supported the 138-bed expansion of Providence

11  Holy Cross Hospital in Mission Hills (also outside his District).  Hospitals in the

12  area were closing or their facilities were shrinking, but Mr. Englander could see a

13  need for expanded hospital facilities.  ████████████████████████

14  ████████████████████████████████████████████

15  ██████████████████  Mr. Englander built a coalition that lobbied

16  successfully—in the face of staunch opposition—for the expansion.  After the

17  hospital was expanded, Mr. Englander was asked to join the Board of Governors, on

18  which he served until 2019.  (And now, as Southern California faces the pandemic

19  challenges, Southern California's need for expanded hospital facilities is more

20  widely recognized.)

21      Mr. Englander's service was not limited to traditional assistance and planned

22  involvement; he instinctively acted to aid in emergencies.  A striking example is his

23  actions on September 12, 2008 at 4:22 pm, when a Union Pacific freight train and a

24  Metrolink commuter train collided head-on in Chatsworth in what was the deadliest

25  train wreck in the United States in the last 25 years.  Mr. Englander was near the

---

[22] Mr. Englander, who was also on the board of the local YMCA at the time, brought the two organizations together for an annual Kids to Camp Community Fundraiser, which allowed PALS youth to attend YMCA summer camps for free.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

27                                                                    Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

scene of the collision, on his way to pick up his children from school, and changed course; he had his wife pick up the kids and he raced to the crash site and began assisting immediately, jumping a chain-link fence to start pulling victims out of the train, many of whom were dead or missing body parts.  Former staff member Millie Jones, who was also at the scene, writes: "As I watched in shock at the first responders bringing bodies off the train, I noticed a man in business attire with his sleeves rolled up and wearing gloves, as he helped retrieve bodies.  When he turned to the side, I realized it was Mitch Englander."  Support Letters, Ex. E-1.  Reverend Spencer T. Kezios, the Chaplain for the Los Angeles Police Department, who was also at the scene, recalls: "I watched him do what no other civilian volunteered to offer for that heart wrenching duty: removing bodies and body parts from the first passenger car."  Support Letters, Ex. D-4.

Mr. Englander stayed at the crash site all night, setting up a makeshift morgue, helping as needed, and praying with one victim's father.  Ten years later, Mr. Englander organized and attended an anniversary memorial/remembrance service to remember the 25 dead and to recognize those who were injured.  Ms. Jones attended the service and explains: "His deep compassion and sincerity when he spoke to the families of the victims and the survivors brought a sense of peace and reassurance to all of us."  Support Letters, Ex. E-1.[23]

Mr. Englander also assisted during the Sayre Fire in 2008, helping hundreds of people evacuate and saving one home by jumping on the roof with a garden hose to attack the approaching flames.  Mr. Englander's younger daughter recalls the gratitude of those in the community: "Once, while eating at a local restaurant, a couple walked up to our table and said, 'Hey, we recognize you.  You are the police

---

[23] Reverend Kezios spoke at the remembrance, including about Mr. Englander's contribution.  *See* https://youtu.be/UpLrCGuuhlo (beginning at 2:35).

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1   officer who saved our home with a garden hose when it was on fire!'"  Support

2   Letters, Ex. B-3.[24]

3              **(b)      Providing a Role Model for Those With Whom He**

4                       **Worked**

5        As Mr. Smith's Chief of Staff, Mr. Englander oversaw a team of City staffers

6   working on legislative affairs and community outreach.  Mr. Englander, having

7   come from a challenging background, and having benefited from being provided

8   opportunities to grow and achieve, made every effort to hire, train, and supervise

9   staff members in a way that would provide them opportunities for personal and

10  professional development.

11       When Mr. Englander became a City Councilmember, he continued to seek out

12  staff members for whom the opportunity could make a meaningful impact, and he

13  remained deeply loyal to his staffers.  For example, in 2013, Mr. Englander hired

14  Millie Jones, who had previously worked for Supervisor Antonovich.  At the time,

15  Ms. Jones was 66 years old and had spent the prior year out of the workforce,

16  ████████████████████████████████████████████████████████████████

17  ██████   Ms. Jones writes to the Court: "Not many elected officials will hire a 66-

18  year old aging lady, when they can hire young, energetic people, willing to work

19  long, demanding hours.  But Mitch and I had worked in close cooperation for our

20  separate officials, and he was familiar with my background and knowledge of the

21  community."  Support Letters, Ex. E-1.

22       Mr. Englander also hired Katherine Lettieri, a single mother of three ███████

23  ████████████████████████████████.  Ms. Lettieri writes: "Mitch took a chance and

24

25       [24] And his work continued when he served on the City Council.  For example,

26  during the Aliso Canyon Gas Leak, the largest in United States history, Mr.

27  Englander helped secure temporary housing for over 20,000 community members

28  who were displaced from their homes.  Support Letter from B. Breckenridge, Ex. E-
    5.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

29                                          Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

1  hired me to work on his staff when there were plenty of more qualified candidates

2  and [he] was fully aware of my situation at the time." Support Letters, Ex. E-2.

3        When Mr. Englander's driver had his license suspended for driving under the

4  influence after just a short time on the job, Mr. Englander made certain he did not

5  lose his job, assigning him other work and doing without a driver—a major

6  inconvenience given the long commute from the Valley to City Hall (time Mr.

7  Englander would use to work). *See* PSR ¶ 75.

8        Mr. Englander maintained close relationships with his staff members, inviting

9  them into his home and taking a sincere interest in their lives. As Ms. Jones

10  explains: "He and Jayne graciously opened their home to his Council District 12

11  staff on many occasions to share in camaraderie and warm fellowship. They both

12  treated us like family and stayed connected in our lives. I recall many times when

13  Mitch rushed to a hospital to visit a member of the community, sit with the family,

14  or go to funerals." Support Letters, Ex. E-1. As evidenced by their letters to this

15  Court, Mr. Englander's former staffers remain supportive.

16       **5.**     **Mr. Englander's City Council Service Had a Positive Impact**

17        Mr. Englander served for seven and a half years on the Los Angeles City

18  Council. He held positions on eight different committees committed to addressing

19  public safety and police reform. Mr. Englander's accomplishments on the City

20  Council include his work toward:

21  •    Reconstructing the San Fernando Valley Rescue Mission, pushing the effort

22       to build a state-of-art homeless shelter with 180 beds after the original

23       building burned down in 2014.[25]

24

25      [25] Former staff member Bree Breckenridge writes: "[W]ith Mitch's guidance,

26  we partnered with the San Fernando Valley Rescue Mission, a non-profit

organization that offers resources, support, and dignity to people experiencing

27  homelessness, and started a mobile fundraising campaign for their Rescue SOS

28  program. In total, we were able to raise over $26,000.00 in community funds to

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

- Launching Operation Equal Access, a program designed to provide underprivileged children access to free computers by refurbishing donated computer equipment;

- Developing the Fire Stat program in 2014, a first of its kind in the nation, which was created to improve Fire Department response times and bring much needed transparency to the Fire Department;[26]

- Leading the effort to require body-worn cameras for police officers in Los Angeles, the first major city to do so, and in the face of considerable opposition;[27] and

- Participating in launching the Feed-in Tariff Program, the largest clean energy initiative in California, generating local renewable energy capacity through a public-private partnership.[28]

---

purchase a new state-of-the art mobile shower."  Support Letters, Ex. E-5.

[26] Mr. Englander and his team created a publicly accessible web-based portal to track emergency room admissions and response times, which ultimately revealed that certain Los Angeles residents were using emergency room services in disproportionate numbers.  Based on this data, Mr. Englander helped to create a pilot program, the "Nurse Practitioner Unit," which helped replace ER care with home visits, thereby conserving hospital resources. The Nurse Practitioner Unit is now the largest of its kind.  *See* https://www.lafd.org/news/lafd-chief-terrazas-announces-launch-firestatla-and-online-publication-response-data.  Once the NPU was in place, Mr. Englander and a team created a Rapid Response Unit allowing paramedics in smaller vehicles and on motorcycles to access patients in outlying, hilly areas.

[27] Former staff member Douglas Tripp explains: "Mitchell was the architect of the plan that brought body-worn cameras to LAPD, making Los Angeles the first major city to require them.  Today, body-worn cameras just make sense.  However, seven years ago when he started his campaign for them it took brilliant strategy, dogged determination, and persuasive advocacy to do what he knew was right and convince others to be visionary alongside him." Support Letters, Ex. E-3.

[28] *See* Feed-in Tariff (FiT) Program, Los Angeles Department of Water and Power, *available at* https://bit.ly/2KJJk1k.  The program, which required

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

**6.** **Support Letters Provide a Fulsome View of Mr. Englander's Lifetime of Hard Work and Service**

Mr. Englander's family, friends, and colleagues submitted many support letters (over 30 of which are attached for the Court's review) attesting to Mr. Englander's character and dedication to family and public service.  These letters, categorized by topic as Family; Childhood; LAPD Reserve Service; Co-Workers; Community Service and Charity Work; and Neighbors and Friends, provide a robust picture of Mr. Englander's character, his challenging early life, his life of public service, and his genuine remorse for his crime.

Harvey Englander, Mr. Englander's uncle, writes: "Mitch gave up a lucrative career in public relations and public affairs to become Councilman Greig Smith's Chief of Staff so he can spend more time helping people in need . . ."  Support Letters, Ex. B-5.  Adam Englander, Mr. Englander's cousin, tied Mr. Englander's commitment to public service to his challenging upbringing: "Mitch has taken the pain [of his childhood] and channeled it into helping others.  He has given his life to public service over the past two decades and has really fought to do good."  Support Letters, Ex. B-7.

Mr. Englander's professional contacts concurred.  Mark Blizzard, a 30-year veteran of the LAPD under whom Mr. Englander worked as a Reserve Officer, writes to the Court: "Mitch Englander was very involved with all the Volunteer Units that I was in charge of (Volunteer Surveillance Team, Volunteer Community Patrol, Volunteer Mounted Patrol, Volunteer Bike Patrol, CEMP, CPAB and PALS).  He worked alongside with all these units and supported them in all their

---

coordination between the Sierra Club, the Clean Air Coalition, the Los Angeles Chamber of Commerce, and the Los Angeles Business Council, among others, now has the most solar installations of any city in the country.  Mr. Englander has been passionate about clean air since he grew up with third-stage smog alerts ████

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

32

Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

activities.  I honestly was amazed at how much time and effort Mitch Englander gave to all these Units and individuals that were volunteering their time to these units."  Support Letters, Ex. D-1.  Sergeant-II Lawrence Bavaro, another LAPD officer with whom Mr. Englander worked, emphasized his focus on charity work: "[Mr. Englander] was instrumental in setting up and funding our Voluntary Community Patrol program, which has now expanded to Topanga Division and is being modeled to expand city wide.  He has provided grants to get very needed equipment for Devonshire Division such as storage sheds, cargo trailer, equipment for our Cadet program and a needed remodeling of our Rollcall Room, Break Room, Watch Commander's office and the front desk.  Mitch continually demonstrates he is a man of character and integrity."  Support Letters, Ex. D-3.

The letters to this Court reflect on Mr. Englander's character: A public service-focused family man who doesn't give up.  Mr. Englander propelled himself to do better—for himself and the family he built and for his community.  He hasn't ever surrendered from a challenge, and he is committed to continuing his service to his family and his community, even with the new challenge of a felony conviction.

### D.  A Probation Sentence Provides Respect For The Law; It Will Achieve Justice

#### 1.  Proper Respect For The Law

As the PSR recognizes, a probationary sentence adequately considers the seriousness of Mr. Englander's offense, demonstrates respect for the law, and exacts just punishment.  *See* Dkt. No. 39 at pp. 2-4.  As the PSR recommendation letter states, a custody sentence would be "aberrant" given Mr. Englander's background and the offense.  *Id*. at p. 3.  Mr. Englander clearly understands the seriousness of his offense.  Indeed, when faced with his illegal conduct, Mr. Englander immediately accepted full responsibility and pled guilty.  He has publicly and privately acknowledged his wrongdoing (*see* PSR ¶¶ 39, 75) and has taken all steps to move forward, to try to reclaim and remake his life.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

33                                                    Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

### 2.   <u>Mr. Englander Presents No Risk of Recidivism</u>

Mr. Englander is 50 years old and this is his first offense.  He has lived a life and career otherwise dedicated to upholding the law and promoting public institutions.  Indeed, he served as an LAPD reservist for 13 years, volunteering his time because of his belief in the value of law enforcement.  He poses no risk of recidivism.  *See* Dkt. No. 39 at p. 3 ("The instant offense notwithstanding, much of [Mr.] Englander's life has evidenced great respect for the law.")  The support letters submitted on Mr. Englander's behalf attest to the genuineness of Mr. Englander's remorse and his clear commitment to lead a life within the law.  As Mr. Burleigh writes: "Mr. Englander made a mistake that ended his career in politics, shattered his confidence in himself, and alienated his constituents and many of his supporters.  It had a profound impact on his marriage and his public persona, as well as the life he was accustomed to.  He is forever branded which will affect certain aspects of his life until the day he dies . . . Regardless of the outcome [of this case], I am confident that Mr. Englander is a better person and will conduct himself morally, ethically and lawfully in whatever he is tasked with in the future."  Support Letters, Ex. D-6.

Mr. Englander can and will continue to contribute to society, as he has done for his entire adult life, and is motivated to never be involved in the criminal justice system again.  Mr. Englander has none of the factors that increase the risk of recidivism and all of the factors that decrease the risk of recidivism.

### (a)   <u>Deterrence – Specific and General</u>

Mr. Englander does not require a sentence of imprisonment to deter him from engaging in criminal conduct in the future.  Over the past approximately 10 months, Mr. Englander and his family have watched—at times, quite literally on the news—their lives turned upside down.  Mr. Englander's consulting business, which was premised on his political relationships, has been severely compromised and his reputation has been forever tarnished.  His fall from grace has been documented in detail under the glare of public scrutiny and media coverage.  He will forever be a

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

"felon" and that will impact him daily.  These collateral consequences have had a tremendous deterrent effect on Mr. Englander personally and serve as a warning for anyone who might consider committing similar offenses.  Mr. Englander has also shown he is amenable to supervision in a non-custodial setting, as he has fully complied with the terms of his pretrial release for nearly a year without incident. *See* PSR ¶ 4.  No one who sees the impact of Mr. Englander's conviction on his life can ever doubt that he has been punished for what he did.

### (b) Protection of the Public

Mr. Englander is not a danger to the public.  His crime was non-violent and caused no physical or financial harm.  Mr. Englander is 50 years old; except for the conduct at issue in this case, he has lived an exemplary life, winning the respect of his peers and community.  Mr. Englander has no other criminal history and, in fact, has a long history of devoting his personal, professional, and volunteer life to upholding the law.  Mr. Englander need not be imprisoned in order to protect the public.[29]  The criminal conduct at issue here was isolated.  Mr. Englander's past shows his law-abiding nature.

### 3. Probation Provides Just Punishment

The severity of a probation sentence should not be underestimated.  As the Supreme Court recognized, probation is not an act of "leniency"; rather "[o]ffenders on probation are [ ] subject to several standard conditions that substantially restrict

---

[29] As the PSR recognizes, "[a] custodial term would be aberrant for other defendants facing a similar guidelines range with a background like Englander's." Dkt. No. 39 at p. 3.  There is simply no reason for an aberrant or disparate sentence here.  Indeed, the Bureau of Justice Statistics indicates that for the years 2014-2016 (the most recent years for which data is available), a clear majority of defendants convicted of violating § 1001 received non-custodial sentences.  *See* Bureau of Justice Statistics, Federal Criminal Case Processing Statistics, *available at* https://www.bjs.gov/fjsrc/tsec.cfm.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

1   their liberty." *Gall v. United States*, 552 U.S. 38, 48 & n.4 (2007).  Certainly Mr.

2   Englander would be under court supervision and restrictions for a period of time.

3        Additionally, the public opprobrium of a felony conviction, particularly for a

4   public person who worked so hard to earn the respect of those around him, cannot

5   be underestimated.  As the letters to the Court reveal, Mr. Englander is deeply

6   ashamed of his conduct; he has gone so far as to discard his recognitions, plaques,

7   and tributes, feeling that his conduct shows he does not deserve the praise he was

8   once given.  Support Letter from L. Englander, Ex. B-3.

9        And Mr. Englander has certainly already lost the life and the livelihood he

10  worked so hard, against all odds, to achieve.  *See* PSR ¶ 90.  His reputation is

11  tarnished, and he will need to find a new way to support himself and his family.  *See*

12  *United States v. Whitmore*, 35 F. App'x 307, 322 (9th Cir. 2002) (affirming district

13  court's finding that destruction of one's "professional capacity and ordinary

14  livelihood constituted a pretty serious punishment already inflicted . . . and one

15  that's likely to be permanent.") (internal citations omitted).  Mr. Englander has been

16  and will forever be punished for his wrongful conduct.  As the USPO's sentencing

17  recommendation observes, "[Mr.] Englander, who has lived comfortably, will likely

18  have continued difficulty generating the type of income he was used to earning, and

19  will almost certainly never hold elected office again."  Dkt. No. 39 at p. 3.

20  **VII.   CONCLUSION**

21       Mr. Englander's life history demonstrates his all-in investment in "doing the

22  right thing" and contributing to his family and his community.  While he committed

23  the crime at issue here, he has been and will be sufficiently punished by a felony

24  conviction and a probation sentence.  This Court can be confident that Mr.

25  Englander has learned from his actions, that he has been punished, and that he will

26  not reoffend.  For the reasons stated above and in the PSR, Mr. Englander asks this

27

28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING

1  Court to impose the recommended sentence of (1) probation for a term of three

2  years;[30] (2) a fine of $9,500; and (3) a special assessment of $100.[31]

3

4  DATED:  January 11, 2021                KENDALL BRILL & KELLY LLP

5

6

7                                    By:  /s/ Janet I. Levine
                                          _____
8                                         Janet I. Levine
                                          Attorneys for Defendant
9                                         Mitchell Englander

10

11

12  _____

13  [30] This sentencing memorandum does not discuss the imposition of a term of
    community service.  Mr. Englander has no objection to and is certainly amenable to
14  performing community service as part of his sentence.  As his history indicates, Mr.
    Englander has served the community for his entire adult life and he will continue to
15  do so with or without a Court order.  In fact, even during the COVID-19 pandemic
    and since his indictment, Mr. Englander and his wife have volunteered with Meals
16  on Wheels to deliver food to seniors living alone.

17
    [31] Mr. Englander's current physical condition, discussed in the PSR at
18  Paragraph 78, is relevant if the Court is considering imposing a term in custody.  As
    this memo is submitted, COVID-19 is raging out of control in California, and no end
19  to the pandemic is in sight.  Certainly COVID-19 has brought to the forefront health
    concerns in custodial settings and the Court understandably has been considering
20  COVID-related impacts in sentencing for almost a year.  These general concerns are
    exacerbated by ongoing health conditions, and personal or family-based health
21  concerns. ██████████████████████████████████████████████
    ████████████████████████████████████████████████████████
22  ████████████████████████████████████████████████████████
    ████████████████████████████████████████████████████████
23  ████████████████████████████████████████████████████████
    ████████████████████████████████████████████████████████
24  ████████████████████████████████████████████████████████
                                                          While he is
25  not of advanced age, he does have relevant medical conditions that necessarily
    impact any sentencing analysis.  See 18 U.S.C. § 3553(a)(2)(D) & (a)(3) (requiring a
26  court to consider "the kinds of sentences available" when sentencing a defendant
    and to impose a sentence that provides the defendant with medical care in the most
27  effective manner).

28

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

37                                      Case No. CR 20-35-JFW
DEFENDANT MITCHELL ENGLANDER'S POSITION REGARDING SENTENCING