TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
MACK E. JENKINS (Cal. Bar No. 242101)
Assistant United States Attorney
Chief, Public Corruption & Civil Rights Section
VERONICA DRAGALIN (Cal. Bar No. 281370)
MELISSA MILLS (Cal. Bar No. 248529)
Assistant United States Attorneys
Public Corruption & Civil Rights Section
        1500 United States Courthouse
        312 North Spring Street
        Los Angeles, California 90012
        Telephone: (213) 894-2091
        Facsimile: (213) 894-2927
        Email:    mack.jenkins@usdoj.gov
                  veronica.dragalin@usdoj.gov
                  melissa.mills@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | No. CR 20-35-JFW |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT MITCHELL ENGLANDER; DECLARATION OF MACK E. JENKINS; EXHIBIT |
| v. | |
| MITCHELL ENGLANDER, | [Exhibit 2 concurrently lodged and filed under seal] |
| Defendant. | |
| | Hearing Date: January 25, 2021 |
| | Hearing Time: 8:00 a.m. |
| | Location:    Courtroom of the Hon. John F. Walter |

        Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Mack E. Jenkins,

Veronica Dragalin, and Melissa Mills, hereby files its Sentencing

1  Position for Defendant Mitchell Englander in the above-captioned

2  case.

3       The government's Sentencing Position is based upon the attached

4  memorandum of points and authorities, Declaration of Mack E. Jenkins

5  and attached Exhibit 1, the concurrently lodged under seal Exhibit 2,

6  the files and records in this case, the Presentence Investigation

7  Report, the Recommendation Letter, and such further evidence and

8  argument as the Court may permit.

9   Dated: January 11, 2021          Respectfully submitted,

10                                   TRACY L. WILKISON
                                     Acting United States Attorney
11
                                     BRANDON D. FOX
12                                   Assistant United States Attorney
                                     Chief, Criminal Division
13

14                                   _____
                                     MACK E. JENKINS
15                                   VERONICA DRAGALIN
                                     MELISSA MILLS
16                                   Assistant United States Attorneys
                                     Attorneys for Plaintiff
17                                   UNITED STATES OF AMERICA

18

19

20

21

22

23

24

25

26

27

28

# Table of Contents

I.    INTRODUCTION.............................................................1

II.   STATEMENT OF FACTS.......................................................2

III.  THE PRESENTENCE INVESTIGATION REPORT.............................7

IV.   GOVERNMENT'S SENTENCING RECOMMENDATION......................10

      A.    Nature and circumstances of the offense(s) warrant a
            meaningful custodial sentence.............................11

      B.    General Deterrence Is Paramount in Public Corruption
            Cases.......................................................13

            1.    A lenient sentence here would embolden, rather
                  than deter, future crime............................15

            2.    Specific deterrence also compels a custodial
                  sentence............................................16

      C.    Need to reflect the seriousness of the offense, to
            promote respect for the law, and to provide just
            punishment for the offense................................18

      D.    History and characteristics of the defendant are both
            aggravating and mitigating................................19

            1.    Defendant had many choices; he chose poorly many
                  times...............................................21

            2.    Community support for a public official involved
                  in a corruption related offense is of limited
                  mitigation value....................................22

            3.    Defendant's prompt guilty plea is a mitigating
                  factor..............................................23

      E.    A lenient sentence will necessarily create unwarranted
            sentencing disparities with less-culpable defendants
            who do not enjoy the same status as defendant...........23

V.    CONCLUSION..............................................................25

1

**<u>Table of Authorities</u>**

2

Page(s)

3

**Cases**

4

<u>Gall v. United States</u>,
     552 U.S. 38 (2007)...........................................10

5

6

<u>United States v. Bistline</u>,
     665 F.3d 758 (6th Cir. 2012)................................20

7

8

<u>United States v. Bragg</u>,
     582 F.3d 965 (9th Cir. 2009).................................9

9

<u>United States v. Brown</u>,
     880 F.3d 399 (7th Cir. 2018)................................14

10

11

<u>United States v. Kuhlman</u>,
     711 F.3d 1321 (11th Cir. 2013)..........................16, 20

12

<u>United States v. Livesay</u>,
     587 F.3d 1274 (11th Cir. 2009)..............................16

13

14

<u>United States v. Martin</u>,
     455 F.3d 1227 (11th Cir. 2006)..............................15

15

16

<u>United States v. Morgan</u>,
     635 F. App'x 423 (10th Cir. 2015)................12, 14, 18, 22

17

<u>United States v. Mueffelman</u>,
     470 F.3d 33 (1st Cir. 2006)...............................9, 14

18

19

<u>United States v. Prosperi</u>,
     686 F.3d 32 (1st Cir. 2012).................................20

20

<u>United States v. Saeteurn</u>,
     504 F.3d 1175 (9th Cir. 2007)...............................24

21

22

<u>United States v. Stefonek</u>,
     179 F.3d 1030 (7th Cir. 1999)............................9, 20

23

24

<u>United States v. Treadwell</u>,
     593 F.3d 990 (9th Cir. 2010)...............................8, 9

25

<u>United States v. Vrdolyak</u>,
     593 F.3d 676 (7th Cir. 2010)................................22

26

27

**Statutes**

28

18 U.S.C. § 371...............................................24

18 U.S.C. § 1001..............................................11, 24

18 U.S.C. § 1503...............................................24

28 U.S.C. § 994(d)...............................................20

**Sentencing Guidelines**

U.S.S.G. § 2B1.1.............................................7, 24

U.S.S.G. § 2J1.2..............................................24

U.S.S.G. § 5H1.2..............................................20

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendant Mitchell Englander was a powerful and wealthy Los Angeles City Councilmember who swore an oath to serve the interests of his constituents.  He swore another oath as a reserve officer with the Los Angeles Police Department to uphold and protect the law.  Instead, defendant illicitly cashed in on his status as a purported public servant in casino bathrooms and through VIP bottle service, luxury dinners, and behind hotel room doors.  Over numerous incidents of escalating corruption and self-preservation, defendant sold out both oaths, cheaply and repeatedly.  After resigning in the middle of his term after he was questioned in the instant investigation, defendant successfully parlayed his government service into a lucrative private practice position as a government consultant with a major entertainment company.

Through his continued corrupt conduct, defendant betrayed his oath to serve the public and betrayed his oath to uphold the law; moreover, defendant did so in a manner that caused a stain not just on him but also on City government and the LAPD.  The effect was to further sever an already fraying trust of the defendant's constituents in those crucial City institutions.  Particularly aggravating, defendant engaged in this pervasive wrongdoing not for any urgent need or as the result of any aberrant life circumstance – he was motivated by plain old-fashioned greed, selfishness, and a desperate desire to cling to his status as a wealthy and powerful City official.  After being provided numerous opportunities to come clean and live up to his oaths, defendant unapologetically chose to do the opposite each and every time.  It was not until facing federal

indictment on seven charges, each supported by overwhelming evidence, that defendant finally dropped his crumbling veneer and agreed to admit essentially all of the facts the government alleged against him.

For his pattern of coolly calculated criminality and trampled public trust that defendant leaves in his wake -- which will cause lasting civic damage by undermining the City's faith in its public servants -- a meaningful term of imprisonment is warranted.  The government respectfully recommends that the Court impose the following sentence: (a) 24 months' imprisonment; (b) three years' supervised release; (c) a $45,000 fine; (d) 300 hours of community service; and (e) a special assessment of $100.

## II.  STATEMENT OF FACTS

In the summer of 2017, the U.S. Attorney's Office and FBI were engaged in an expansive inquiry into corruption within the City of Los Angeles.  The investigation focused primarily on corrupt relationships between City officials, their proxies, and real estate developers and their proxies, including foreign nationals and entities.  It also examined the City system that empowered certain City officials to wield outsized influence on the business decisions of, particularly, real estate and related companies.  A key focus of the government was close review of the required Statement of Economic Interest - Form 700 for numerous City officials.  The California Fair Political Practices Commission mandates important financial disclosures via the Form 700 as a means to monitor City officials' financial relationships, and their public disclosure is intended to deter cultivating corrupt relationships.  (CR 1 "Indictment" ¶ 4.) However, because it relies entirely on the candor of the reporting

official, it is a check that is easy to evade and difficult to enforce.

In June 2017, defendant was an elected City Councilmember representing Council District 12 in the San Fernando Valley.  He served as the Council President Pro-Tempore and was a member of several powerful committees, including the Planning and Land Use Management ("PLUM") Committee.  Defendant was also a reserve member of the LAPD.  (PSR ¶¶ 7-8.)  As an elected public official, defendant had a duty to prioritize loyalty to his constituents, the laws, and ethical principles above private gain.  As a law enforcement officer, he took an oath to uphold the law.  Between June 2017 and his arrest in March 2020, defendant repeatedly breached this duty and oath.

In June 2017, defendant accepted benefits from a businessperson on trips in Las Vegas and Palm Springs, including a total of $15,000 in cash inside casino bathrooms on two separate occasions, hotel accommodations, an extravagant meal, approximately $34,000 in bottle service at a nightclub, and escort services sent to defendant's hotel room.  Other public officials accompanied defendant on the Las Vegas trip, including a high-ranking member of defendant's staff and George Esparza, a staffer for Jose Huizar, who was a fellow City councilmember and chair of the PLUM Committee.  (PSR ¶¶ 9-13.)  Days after these trips, defendant agreed to and did arrange for the businessperson to meet a developer to promote his business.  (PSR ¶ 14.)

Defendant's first violation of the public's trust occurred when he accepted the financial benefits provided by Businessperson A.  Any reasonable private citizen would think twice before accepting $15,000 in cold cash without a purpose.  One would certainly have to question

whether such a generous "gift" could, in return, leave the recipient vulnerable to distasteful requests or demands in the future.  That potential was heightened given defendant's position as an elected official bound by certain laws and ethical requirements.  By accepting cash from a businessperson with no personal ties to him and seeking business favors, defendant opened himself up to improper influence and potential blackmail.  He violated ethics rules by failing to report the lavish gifts on his Form 700.  (PSR ¶ 30.) Defendant's willingness to ingratiate himself with a businessperson who wanted something from him -- something that defendant could provide -- and who provided him lavish gifts was the start of a concerning and predictable relationship.  In the government's view, the evidence shows it likely would have blossomed into federal bribery had law enforcement not intervened, and had the businessperson not made the choice to accept accountability and cooperate in the federal investigation.

By August 2017, defendant learned that the FBI was investigating the Las Vegas trip.  (CR 24 ¶ 9; PSR ¶ 16.)  After learning of the federal investigation, defendant engaged in a campaign of false statements, obstruction, and witness tampering that repeatedly violated his duties and responsibilities as an elected official and member of law enforcement.  Defendant's obstruction campaign was calculated, extensive in scope and duration, and designed to mislead investigators at every turn through multiple means.

Shortly after learning about the investigation, defendant created a document to mislead investigators.  Although months had passed since the June 1, 2017 trip and defendant had since met with Businessperson A on at least two occasions without offering to

reimburse any expenses, he sent a reimbursement check to
Businessperson A only after learning that the FBI was asking
questions, and backdated the check to give the impression he intended
to reimburse the expenses before the FBI reached out to request an
interview.  (PSR ¶¶ 13-16.)

By October 4, 2017, defendant had learned that the FBI had
interviewed three witnesses from the Las Vegas trip: Businessperson
A, City Staffer B, and George Esparza.  (PSR ¶ 17.)  Defendant began
coordinating his story with other witnesses, including by meeting
with City Staffer B and by telling Businessperson A what City Staffer
B had been asked and how he responded to FBI questioning.  (Id.)

Defendant had more than one month to consider the choice he
would make when the FBI asked him questions.  He hired prominent
attorneys to counsel him and had weeks to consider his options when
confronted with a difficult choice.  (PSR ¶¶ 16, 18.)  Defendant
could have come clean about accepting $15,000 in cash from a
businessperson who had suspicious dealings with multiple public
officials in Los Angeles, which would have helped federal
investigators uncover public corruption.  Or defendant could have
simply exercised his right not to speak with the FBI.  Instead, he
made the wrong choice at every turn.

Over the course of 18 months, defendant spoke to federal
investigators on three separate occasions and repeatedly espoused
false statements to cover up his unethical behavior and his
increasingly criminal conduct.  (PSR ¶¶ 18, 25, 33-36.)  Defendant's
last FBI interview, on December 31, 2018, occurred less than two
months after the FBI executed widely publicized search warrants at
Jose Huizar's residence and City offices.  Armed with personal

knowledge that a corrupt businessperson who had ties to Huizar's staffer had also provided $15,000 in cash to defendant, he still chose to mislead investigators by lying about his own receipt of gifts from this individual.  (PSR ¶¶ 33-36.)

Defendant did not stop at repeatedly lying to federal agents and prosecutors.  His attempts to thwart the investigation and cover his tracks escalated over time, employing obstructionist tactics in a calculated campaign to keep investigators from learning the truth about his conduct.  Defendant used encrypted and disappearing messages to coordinate his story with another witness, and then he lied to the FBI about ever using that messaging service at all.  (PSR ¶¶ 15, 19, 20, 22, 26, 36.)  He urged Businessperson A to use a different phone number when discussing the FBI, demonstrating a concern that their phones were being tapped and a calculated intent to avoid detection.  (PSR ¶ 20.)  Defendant changed a meeting location at the last minute, "turned up the car stereo volume" and "drove in circles around the block" while directing Businessperson A on how to respond to FBI questions, again demonstrating an attempt to avoid law enforcement surveillance and listening devices.[1] (PSR ¶ 27.)

Most egregiously, defendant was caught red-handed on recordings attempting to repeatedly tamper with a witness in the federal investigation.  He brazenly directed Businessperson A how to answer

---

[1] As can be heard on the audio recording, when Businessperson A first entered defendant's car, the radio was not on and defendant spoke at a normal volume when exchanging innocuous greetings. However, he then turned on the radio and turned up the volume and lowered his voice to a whisper right when he stated, "so I met with them again," referring to his FBI interview five days earlier. See Exhibit 2 at 00:00-00:32 (concurrently lodged under seal).

questions from the FBI, what information to withhold, and how to lie to the FBI.  See, e.g., PSR ¶ 25(e) (defendant told Businessperson A "what questions to expect, what to say, and what not say during the interviews"), ¶ 27 ("we never had a conversation ... don't mention it at all"); Exhibits 1-2.  Defendant repeatedly portrayed himself as someone knowledgeable about how investigators would approach the interview.  (PSR ¶¶ 22, 28, 32.)  Only after being confronted with irrefutable evidence of his crimes – which included recordings of his own words - did defendant finally admit he "counseled Businessperson A how to lie to and mislead the FBI and USAO."  (CR 24 ¶ 8.)

Between his last interview in December 2018 and his arrest in March 2020, defendant had time to reflect on his actions, his past choices, and the way he betrayed the citizens he was elected to represent, his fellow public servants who serve with honor and integrity, and his fellow law enforcement officers who uphold the law even in difficult circumstances.  After leaving public service early with two years left in his elected term, defendant used his public platform to secure a lucrative career in private practice without ever correcting the multiple false statements that he had made to investigators in an attempt to protect himself and his earning potential.  The citizens of Los Angeles expect and deserve more from their elected officials and public servants.

III. **THE PRESENTENCE INVESTIGATION REPORT**

On December 21, 2020, the USPO disclosed the PSR and its recommendation letter.  (CR 39 "PSR Ltr."; CR 40.)  The USPO found that defendant's total offense level was 4, based on a base offense level of 6 under U.S.S.G. § 2B1.1, and no additional specific offense characteristics or adjustments.  The government concurs with the

7

USPO's calculation of Criminal History Category I.  With respect to imprisonment, the USPO recommended the lowest possible sentence of no custody and three years of probation.  However, the USPO also found that the factors called for the high-end of the fine range and recommended a $9,500 fine along with a $100 special assessment.[2] (PSR Ltr.)  The USPO recommended no community service.  The government objected to the USPO's Guidelines calculations and calculated the total Guidelines offense level to be 15 (CR 41 "Gov't Objections"), resulting in a Guidelines range of 18 to 24 months' imprisonment and a fine range of $7,500 to $75,000.  U.S.S.G. § 5E1.2.  As the PSR notes, defendant agreed not to appeal the Court's sentence provided it does not exceed 36 months' imprisonment; the government agreed not to appeal provided defendant is sentenced to at least 18 months' custody.  (PSR ¶ 4; CR 24 "Plea Agreement" ¶¶ 14-15).

    As previewed in its objections (Gov't Objections at 1 fn.1), the

_____

[2] No justification for this lopsided recommendation is offered or apparent.  Absent any explanation to the contrary, it stands to reason that whatever the USPO's rationale may be for recommending a sentence at the high end of the applicable guideline for a fine in this case, it would similarly compel a recommendation for a sentence of high-end imprisonment.  Otherwise, this apparent disparity would operate to afford defendant – a former City Councilman and law enforcement officer with financial means, influence, and name recognition — the advantage of paying more money in order to avoid serving prison time that would otherwise be warranted under the overall sentencing framework.  Any such bias, whether implicit or otherwise, favoring wealthy and powerful defendants over defendants without substantial resources or influence is not consistent with justice and the Guidelines.  See United States v. Treadwell, 593 F.3d 990, 1012-13 (9th Cir. 2010).  As outlined below, this disparate treatment seems interwoven throughout the USPO's support for its probationary recommendation.

government also respectfully submits that the USPO improperly analyzed the § 3553(a) factors.  More concerning, by disproportionately emphasizing certain mitigating factors, incorrectly relying on speculative collateral consequences, and ignoring or minimizing other aggravating factors and required statutory factors, the proffered analysis results in a two-tier system of justice – a more flexible and lenient one for white-collar defendants, and a more rigid and severe one for "other" criminals. As detailed at length below, courts across the country have rejected this dichotomy as inconsistent with fundamental fairness and the statutory goals of sentencing.  See Treadwell, 593 F.3d at 1012–13 (overruled on other grounds) (rejecting the principle that a defendant of means should be afforded a lower prison sentence to enable him to pay restitution to his fraud victims, and noting the critical importance of "the minimization of discrepancies between white- and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail") (quoting United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006)); United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999) (white-collar criminals are "not to be treated more leniently than members of the 'criminal class'").

While it is certainly true that various § 3353(a) factors can be weighted differently by reasonable minds, the law requires they not be weighed to unjustly favor certain classes of defendants and disfavor others; furthermore, no factors should be omitted from the balancing.  See United States v. Bragg, 582 F.3d 965, 969 (9th Cir. 2009) ("The very broad discretion of district judges in sentencing post-Booker does not extend to ignoring sentencing factors mandated

1   by statute."); <u>Gall v. United States</u>, 552 U.S. 38, 49–50, (2007)

2   (district judges are required to "consider <u>all</u> of the § 3553(a)

3   factors to determine whether they support the sentence requested by a

4   party") (emphasis added).  Unfortunately, the USPO's § 3553(a)

5   analysis suffers both these infirmities.

6   **IV.  GOVERNMENT'S SENTENCING RECOMMENDATION**

7       It is inescapable that this case is, at its core, borne from

8   corruption.  Public corruption is not a victimless crime.[3]

9   Obstruction of justice and witness tampering by a public official and

10  LAPD reserve officer are not victimless crimes, even where the

11  witness is an FBI source.  More than ever, when a public official is

12  revealed to have cashed in on his oath, lied to federal agents to

13  protect his career and image, and endeavored to corrupt others

14  through obstruction, the harm to the public's trust in its government

15  is deeply and lastingly affected.  Adding to the import of this case,

16  uncovering this type of conduct is often exceptionally difficult and

17  takes years of dedicated investigation.  Moreover, success of these

18  investigations often hinges on a conspirator actually taking

19  accountability for their actions and agreeing to cooperate.  For

20  example, had Businessperson A ultimately not elected to come clean,

21  it is highly likely that defendant's conduct would have gone

22  undetected and his lies would have been rewarded.  Attempts to

23  minimize the core corruption conduct here or disconnect it from its

24

25

26      [3] <u>See</u>, <u>e.g.</u>, Divoungy, O. and Hill, B., "Corruption Costs
    Illinois Taxpayers at Least $550M Per Year" (discussing how not only
    does corruption lessen residents' faith in the government, it
27  decreases economic growth and disincentivizes investments in the
    state), available at
28  https://www.illinoispolicy.org/reports/corruption-costs-illinois-
    taxpayers-at-least-550m-per-year/.

resultant public harm are refuted by the facts and otherwise do a disservice to the statutory goals of sentencing.

The government respectfully requests that the Court adopt the factual findings and criminal history calculation of the PSR in this matter (subject to the objections lodged by the government at CR 41), and the additional factual information in this sentencing position. Defendant's total offense level should be 15.  However, regardless of the final Guidelines calculation, the government's recommended sentence is grounded in a balancing of the aggravating and mitigating § 3553(a) factors, as set forth below.  In accordance with the § 3553(a) factors and the foregoing, the government recommends that the Court impose the following sentence: (a) 24 months of imprisonment; (b) three years of supervised release; (c) $45,000 fine;[4] (d) 300 hours of community service;[5] and (e) a special assessment of $100.

**A.    Nature and circumstances of the offense(s) warrant a meaningful custodial sentence**

Contrary to the USPO's conclusion that this was a "relatively simple" offense, this was not a run-of-the-mill violation of 18

___

[4] The government calculates the fine range as $7,500 to $75,000 based on an offense level 15.  U.S.S.G. § 5E1.2.  $45,000 represents three times the $15,000 in cash defendant was unjustly enriched by Businessperson A (not accounting for the other thousands defendant accepted as gifts in Las Vegas and at various dinners) and is slightly above the mid-range of the Guidelines.  The government believes the weight of the sentence should be focused on the custodial term but with a significant fine added to support the overall sentence and address the financial gain to defendant by his conduct.  The PSR supports defendant's ability to pay a fine in this amount (at minimum, by the end of his supervised release term).

[5] Given the obstacles defendant overcame from his childhood and his work in the public sector, and given that he works from home as a consultant and thus maintains a flexible schedule, he seems a prime candidate for a sentence including community service. He can help others avoid the mistakes he made and give back to the community whose trust he violated.

U.S.C. § 1001.  Far from it.  The PSR itself refutes its own dismissive description as the offense conduct here spans 30 paragraphs of the PSR, not including numerous subparagraphs. (PSR ¶¶ 6-36.)  As a reserve LAPD law enforcement officer himself – a background that most 1001 defendants inarguably lack - defendant knew how critical it was for law enforcement to interview witnesses and obtain truthful statements from witnesses.  He knew that his truthful statements would be valuable information and would help uncover corrupt conduct by a businessperson who provided concealed benefits to elected and public officials and corrupt conduct by those officials who accepted said benefits.  Defendant also knew that his false statements would hinder the FBI's investigation; indeed, that was his goal.  Even private citizens are expected to provide truthful information in connection with a federal investigation.  Private citizens are often called upon to give statements and testify to ensure that criminals are prosecuted and convicted in order to protect the public.  Of course, when a witness occupies a position of trust such as law enforcement or elected office, this expectation is significantly heightened.

When faced with sentencing conduct that adversely impacts public trust in the fairness and integrity of government, also "at stake is the collective reputation of all elected officials, particularly those at the pinnacle of power and prestige. What happens when that public trust is abused by corrupt acts? The offender's reputation is sullied and with it the reputation of honest and stalwart public servants. ***The judicial response to demonstrated corruption by the political elite and the lapse of duty, honor, and integrity it represents is as important as the corruption itself***." United States

1  v. Morgan, 635 F. App'x 423, 447 (10th Cir. 2015) (reversing district

2  court and finding sentence of probation unreasonable in public

3  corruption case of state senator).

4       The PSR Letter addresses defendant's criminal conduct in a

5  cursory paragraph that apparently draws no connection between

6  defendant's public official status and the $15,000 in secret cash

7  that he accepted from a businessperson seeking to buy his influence.[6]

8  It does not analyze or even reference Businessperson A's critical

9  context to defendant's deceptive actions.  In particular, it goes

10 unmentioned that "Businessperson A was seeking to increase his

11 business opportunities in the City.  Among the ways Businessperson A

12 would accomplish this was to provide certain elected and other public

13 officials with" a sundry of illicit benefits. (Indictment ¶ 5.)  The

14 PSR Letter does not address how many times defendant chose to lie, or

15 over what period of time; it does not address how many times he

16 attempted to tamper with a witness.  These omissions undermine the

17 true harm and corrupt nature of the offenses defendant committed.

18 The nature and circumstances of the offenses conduct warrant a

19 meaningful custodial sentence.

20      **B.   General Deterrence Is Paramount in Public Corruption Cases**

21      Courts have identified why general deterrence is uniquely

22

23 _____

24      [6] Despite having a "related case" section in the PSR, the PSR
   also overlooks that Businessperson A plays a prominent role in the
   racketeering bribery scheme in related case United States v. Jose
25 Huizar, et al., 20-CR-326(A)-JFW.  There, City Councilmember Jose
   Huizar is alleged to have accepted a series of bribes and payments
26 from Businessperson A as part of Businessperson A's attempt to use
   Huizar's City councilmember status to increase business
27 opportunities.  See CR 74, First Superseding Indictment, Overt Act
   Nos. 301-333.  The parallels of Businessperson A's role in the
28 (admittedly more developed) bribery case against Huizar and his
   interactions with defendant here should not be ignored.

critical to public corruption crimes. "*General deterrence comes from a probability of conviction and significant consequences*. If either is eliminated or minimized, the deterrent effect is proportionately minimized. This country depends on honest representative democracy and, while our system is imperfect, it does not generally suffer from widespread corruption. Its proper functioning requires elected officials to serve the common good, not illicit personal gain. Our citizens place faith in the honesty and integrity of elected officials. *Without meaningful consequences for a breach of trust, their trust is no more than blind trust*." Morgan, 635 F. App'x 423, 450.  By their nature, white-collar crimes are often difficult to detect; this makes enhanced general deterrence even more necessary. See United States v. Brown, 880 F.3d 399 (7th Cir. 2018) (district court did not err in relying on idea that white-collar criminals were prime candidates for general deterrence; district court was entitled to conclude that where there was a lower likelihood of getting caught, a serious penalty was necessary to ensure deterrence).

Congress has recognized that deterrence is a crucial factor in sentencing decisions for economic and public corruption crimes such as this one.  See S.Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("[A] purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business."); United States v. Mueffelman, 470 F.3d 33, 40 (1st Cir. 2006) (recognizing importance of "the deterrence of white-collar

14

crime (of central concern to Congress), the minimization of discrepancies between white-and blue-collar offenses, and limits on the ability of those with money or earning potential to buy their way out of jail").

Finally, not only is general deterrence a particularly critical goal in sentencing white-collar defendants, importantly, courts have recognized it is also a particularly *effective* sentencing tool in such cases.  This is because white collar criminals often premeditate their crimes and engage in a cost-benefit analysis.  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment.").  Defendant's conduct here falls squarely within the type of criminality Congress and courts target for general deterrence.

> 1.   A lenient sentence here would embolden, rather than deter, future crime

As set forth above, one of the primary objectives of sentencing elected officials is to make clear to other public officials that abusing their position of trust and violating the law by profiting off their position and obstructing justice are serious breaches of their oath that carry with them a correspondingly serious punishment. Imposing a lenient sentence in this case would send the opposite message - it would encourage rather than discourage public officials from obstructing public corruption probes by supporting a reasonable

15

conclusions that (1) they will face minimal criminal penalty if caught, and (2) if they *successfully* obstruct, they will maintain their political image, their power, and their pathway to a lucrative future.  In such a calculus, for those inclined toward corruption, obstructing justice and committing crimes simply become a worthwhile investment to maintain status as a public official and exploit it for personal gain.  This calculus cannot be endorsed in a functioning democracy.  Where that leniency drops to the level of a probationary sentence notwithstanding the egregious facts of defendant's conduct here, the failing is even more stark. "The threat of spending time on probation simply does not, and cannot, provide the same level of deterrence as can the threat of incarceration in a federal penitentiary for a meaningful period of time." United States v. Livesay, 587 F.3d 1274, 1279 (11th Cir. 2009); see also United States v. Kuhlman, 711 F.3d 1321, 1328 (11th Cir. 2013) ("We are hard-pressed to see how a non-custodial sentence serves the goal of general deterrence.").

     2.   Specific deterrence also compels a custodial sentence

While making no reference to general deterrence, the USPO concludes that a probationary sentence will achieve specific deterrence of defendant because he has support from family, friends, community members, and other "positive influences in his life." (PSR Ltr. at 3).  The problem with this analysis is that it does not address the fact that defendant enjoyed each of these positive influences in his life throughout the entire time that he: (a) took illicit cash in bathrooms from a businessperson seeking to buy influence; (b) enjoyed luxury benefits as a public official and hid them on his Form 700; (c) lied to the FBI, repeatedly; and (d)

16

obstructed justice by endeavoring to tamper with a witness, repeatedly. In addition, the quantitative nature of defendant's conduct here strongly supports the need for strong *specific* deterrence, especially when compared to other defendants who engaged in just a single act of criminality. That is, when defendant first elected to sit down for an interview, his criminal defense lawyer by his side, with the FBI and USAO who were conducting a pay-to-play corruption investigation into the City, defendant had plenty of time to think about exactly what he would do. He also had plenty of time to realize he was in serious trouble. Defendant knew this because he had very recently received a series of illicit gifts from Businessperson A. Yet, during this extensive interview, defendant did not break down, he did not confess, he did not express accountability or suggest a hint of remorse. He did the opposite; he lied and then he obstructed. This exact scenario played itself out again in February 2018, except now defendant knew he was in even *deeper* trouble because he had committed new criminal conduct with his lies and obstruction. Yet, instead of being deterred from additional crimes, defendant doubled down on the lies and doubled down on the obstruction. Tellingly, this scenario repeated itself for a third time in December 2018 as defendant futilely hoped that his abrupt exit from public service to the greener pastures of private practice would also hasten his escape from this investigation's focus. As a result, his conduct got more brazen and more resolute; and it resulted in more lies and more obstruction. Analyzed under the timeline of defendant's continuing and escalating conduct, a significant term of imprisonment is necessary to specifically deter defendant from future criminal conduct and lies.

17

**C.   Need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense**

In reaching an appropriate sentence, this Court must consider "the seriousness of the offense and its harm to the reputation of honest public servants and the public faith in legitimate state government." <u>Morgan</u>, 635 F. App'x 423, 448.  In considering "the need for the sentence imposed to promote respect for the law and to provide just punishment for the offense," a sentence of probation would be "grossly inappropriate" in this case.  <u>Id</u>. at 451.  Congress has recognized that in major white-collar cases, probation has been granted "without due consideration being given to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance."  S.Rep. No. 98-225, at 91-92 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3274-75.

A scheme to deceive federal investigators investigating you and others for significant misconduct is a serious crime that shows a lack of respect for the law, a lack of respect for law enforcement, and warrants meaningful punishment.  It is essential that witnesses provide truthful statements if they choose to provide any statement at all.  Lying to investigators helps other criminals go unpunished (not just the person who lies), risks incriminating innocent people, significantly increases the taxpayer-funded expense of investigations, and diverts government resources away from other important matters.  Here, defendant was aware that the federal government was investigating benefits provided by a businessperson to multiple public officials, including defendant himself.  Defendant knew that agents were interviewing multiple witnesses in this

18

corruption probe.  As the USPO recognized, defendant's conduct was "wholly unbecoming [of] a public official" and "undermined the public's trust." (PSR Ltr. at p. 3.)  By lying to the FBI and attempting to tamper with a witness in a federal corruption investigation, not only did defendant violate his oath of office, he violated the trust of his electorate.  The entire public suffers as a result.  Just punishment demands a significant period of incarceration.

> **D.   History and characteristics of the defendant are both aggravating and mitigating**

As the USPO points out, defendant has been married for several decades to a "supportive and empathetic spouse," has a close relationship with his children, has a "wide variety of positive influences in his life," and is "well supported by his friends and family, who have rallied around him during this difficult time" as have "community members and associates." (PSR Ltr. at p. 3.)  The government agrees that defendant, now 50, has commendably overcome a "difficult and traumatic" upbringing and impressively rose to the level of an elected City Councilmember, a reserve member of the LAPD, and a County supervisor candidate.  He then parlayed that to a lucrative career in private practice.  Defendant has no criminal convictions apart from the instant conviction.

However, based on the limited analysis provided in its letter, the USPO's recommendation of a probationary sentence seems to rely in large part on defendant's public official status and standing in the community and the collateral consequences facing such a defendant. See PSR Ltr. at p. 3 (noting that defendant's "arrest and conviction have been very public and that he has suffered these additional

humiliations").  Courts have repeatedly made clear that this type of disparate treatment favoring certain classes of defendants is improper.  "*[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose* by conviction." United States v. Prosperi, 686 F.3d 32, 47 (1st Cir. 2012); see also 28 U.S.C. § 994(d) (requiring sentencing guidelines to be "entirely neutral as to ... socioeconomic status of offenders); U.S.S.G. §§ 5H1.2 ("[e]ducation and vocational skills are not ordinarily relevant in determining whether a departure is warranted"), 5H1.5 ("[e]mployment record is not ordinarily relevant in determining whether a departure is warranted"), 5H1.10 (socio-economic status is "not relevant in the determination of a sentence").  Collateral consequences "related to a defendant's humiliation before his community, neighbors, and friends would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines. And '*[w]e do not believe criminals with privileged backgrounds are more entitled to leniency than those who have nothing left to lose*.'" United States v. Bistline, 665 F.3d 758, 760 (6th Cir. 2012) (citation omitted).

The USPO also points out that defendant "has lived comfortably" and will likely have "difficulty generating the type of income he was used to earning." (PSR Ltr. at p. 3.)  Once again, relying on this type of purported mitigating factor to recommend the lowest possible sentence is improper.  Individuals, like defendant, who have earned significant levels of professional success and thus are able "to make a decent living without resorting to crime *are more rather than less*

20

1    culpable than their desperately poor and deprived brethren in crime."

2    United States v. Stefonek, 179 F.3d 1030, 1038 (7th Cir. 1999); see

3    also United States v. Kuhlman, 711 F.3d 1321, 1329 (11th Cir. 2013)

4    ("The Sentencing Guidelines authorize no special sentencing discounts

5    on account of economic or social status.").

6         Particularly given defendant's extensive aggravating conduct

7    here, defendant's personal status and characteristics do not warrant

8    the special type of treatment recommended by the USPO.  Moreover, the

9    USPO's analysis views them through an exclusively mitigating lens.

10   As a result, its analysis skews in favor of defendant without

11   considering the equally and in some cases more compelling view that

12   certain of defendant's personal characteristics also contain an

13   aggravating quality.  The government avers a more evenhanded analysis

14   of these factors supports the government's recommended sentence.

15        1.   Defendant had many choices; he chose poorly many times

16        Defendant is privileged to have family and community support; he

17   does not appear to have mental health or substance abuse problems.

18   These are positive facts.  The combination of these advantages also

19   make him unlike many of the defendants that come before this Court

20   who have committed crimes, at least in part, owed to one or more of

21   these factors.  For those defendants, such factors do not exonerate

22   but certainly may mitigate their criminal conduct.  By contrast,

23   consideration of these factors makes defendant's criminal conduct

24   here all the more inexcusable.  He had a choice.  In fact, he had

25   many choices.  This is not the case of a defendant driven to drug

26   sales because he grew up in a drug house and so drug selling became

27   the only tangible skill he achieved as a result.  This is not the

28   case of a defendant driven to aberrant criminal behavior due to a

1   spiraling addiction.  Nor is it the case of a defendant driven to

2   crime because he was abandoned by society at the time of his conduct.

3   Defendant was not suffering from the onset of any mental ailments

4   each time he took a luxurious benefit then deliberately hid it on his

5   Form 700, or each time he lied to the federal government about his

6   conduct, or each time he attempted to corrupt the testimony of a key

7   witness to his wrongful actions.  Properly evaluated through this

8   framework, defendant's personal status during the period of his

9   conduct in this case is an aggravating factor.

10          2.   Community support for a public official involved in a
                 corruption related offense is of limited mitigation
11               value

12          Politicians convicted of offenses still often maintain a cadre

13   of support from long-time colleagues and/or constituents who, while

14   not seeking to minimize the criminal conduct, seek to highlight their

15   personal view of defendant's laudatory accomplishments; but their

16   import at sentencing should not be overstated.  See United States v.

17   Vrdolyak, 593 F.3d 676, 683 (7th Cir. 2010) ("Politicians are in the

18   business of dispensing favors; and while gratitude like charity is a

19   virtue, expressions of gratitude by beneficiaries of politicians'

20   largesse should not weigh in sentencing.").  Defendant's ability to

21   gather many letters of support, including from prominent individuals

22   in the community, is "certainly impressive but not surprising....

23   One does not become [an elected City Councilmember and Council]

24   President Pro Tem without the confidence of many supporters, some

25   quite influential.  The letters must be viewed in that light."

26   Morgan, 635 F. App'x at 450.

27

28

1

            3.   <u>Defendant's prompt guilty plea is a mitigating factor</u>

2      A true mitigating factor is defendant's prompt guilty plea in

3   this case and his related expressions of remorse.  Defendant did not

4   engage in frivolous litigation.  Instead, he quickly and clearly

5   communicated, through counsel, an interest in rapidly resolving his

6   case; and he then did so, pandemic notwithstanding.  Where a public

7   official publically and promptly concedes to the correct result, it

8   meaningfully serves the public by providing finality and clarity.  In

9   consideration of this factor along with learning of defendant's

10   upbringing through defense counsel and the PSR, the government in

11   fact reduced its originally intended recommended sentence of 36

12   months to the current recommendation of 24 months.[7]

13        **E.   A lenient sentence will necessarily create unwarranted**

14              **sentencing disparities with less-culpable defendants who do not enjoy the same status as defendant**

15      The USPO argues that a "custodial term would be aberrant for

16   other defendants facing a similar guideline range with a background

17   like Englander's." (PSR Ltr. at p. 3.)  It is unclear what the basis

18   for this conclusion is, but, in any event, the facts and law show it

19   is deeply flawed.  The Guidelines make clear that the imposed

20   sentence for each individual defendant must reflect the sometimes

21   vastly disparate ways different defendants may commit the same crime.

22   The range is a range for a reason.  Where there are aggravating

23   factors for a defendant and his conduct, the court should increase

24   the sentence within or above that range to a degree rooted in the

25   court's analysis of the § 3553(a) and guideline factors.  Calling a

26

27      [7] Defendant's plea agreement allows the government to recommend a sentence up to 60 months' custody and, as stated above, defendant

28   agreed to an appellate waiver of 36 months' imprisonment.  (CR 24 ¶ 14.)

custodial term for the undisputed factual scenario here "aberrant" is irreconcilable with these facts and rejected by the proper weighing of the statutory factors, as set forth above.  Quite to the contrary, compare sentencing: (a) a wealthy and powerful former City councilman for criminal conduct stemming from (b) his repeated acceptance of illicit benefits spanning the gamut of stereotypical corruption, (c) his repeated material lies to the federal government investigating his conduct over a significant period of time, and (d) his extensive and multiple efforts at obstruction of a key witness to the exact same term as a private citizen who, on a single federal form, falsely checked one box is the height of unwarranted sentencing disparity. Yet this is precisely the grossly inequitable treatment that would be occasioned by a probationary sentence here.

        "Congress's primary goal in enacting [18 U.S.C.] § 3553(a)(6) was to promote national uniformity in sentencing." United States v. Saeteurn, 504 F.3d 1175, 1181 (9th Cir. 2007) (citation omitted). Data available from the United States Sentencing Commission for fiscal year 2019 for 97 nationwide cases shows that the average imprisonment length for defendants sentenced under U.S.S.G. § 2J1.2 with Criminal History Category I was 17 months.  See United States Sentencing Commission Interactive Data Analyzer, available at https://ida.ussc.gov/analytics/saw.dll?Dashboard.  Using the more general fraud based U.S.S.G. § 2B1.1, data for fiscal year 2019 for 3,977 nationwide cases shows an average imprisonment length of 27 months.  In addition, a custodial sentence of 24 months in custody is consistent with comparable sentences for other false statement cases

24

1   by public officials recently imposed in this district.[8]

2   **V.    CONCLUSION**

3          For the foregoing reasons, the government respectfully requests

4   that the Court impose the following sentence: 24 months of

5   imprisonment, followed by three years of supervised release, a

6   $45,500 fine, 300 hours of community service, and a special

7   assessment of $100.

---

24         [8] See, e.g., United States v. Leroy Baca, Case No. 16-CR-66(A)-
       PA (defendant, former sheriff of the Los Angeles Sheriff's
25     Department, sentenced to 36 months in custody after jury trial
       conviction on one count of conspiracy in violation of 18 U.S.C.
26     § 371, one count of making false statements in violation of 18 U.S.C.
       § 1001, and one count of obstruction of justice in violation of 18
27     U.S.C. § 1503); United States v. Byron Dredd, Case No. 15-CR-569-DSF
       (defendant, former Los Angeles Sheriff's Department deputy, sentenced
28     to 12 months in custody after jury trial conviction on one count of
       making false statements in violation of 18 U.S.C. § 1001).